**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harmon Wesley SHIELDS & Jack Vernon Quick, Defendants-Appellants.**

No. 80–5755.

United States Court of Appeals,
Eleventh Circuit.

May 10, 1982.

Neal P. Rutledge, Washington, D. C., for Shields.

Mark L. Angert, Entin, Schwartz, Angert & Dion, Ronald A. Dion, Miami, Fla., Clyde M. Taylor, Jr., Tallahassee, Fla., for Quick.

William M. James, Jr., U. S. Dept. of Justice, Tampa, Fla., William C. Bryson, Margaret I. Miller, Washington, D. C., for plaintiff-appellee.

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Appellants Harmon Shields and Jack Quick were convicted by a jury on one count of conspiracy to obstruct interstate commerce by extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951, and on two counts of attempting to commit the substantive offense, in violation of 18 U.S.C. §§ 1951 and 1952. On appeal, they contend certain evidence was improperly admitted, assert a *Brady* violation, and challenge the sufficiency of the evidence on which they were found guilty. After careful consideration of their contentions, we affirm their convictions.

## I. The Facts

In order to acquire tracts of land for parks and environmental preserves, the State of Florida adopted the Environmentally Endangered Lands Program. Before land could be purchased by the state under this program, Florida's Interagency Advisory Committee ("IAC") had to recommend the purchase to the governor and his cabinet. Appellant Shields, as executive director of the Florida Department of Natural Resources, served as chairman of the IAC and thus had considerable influence over which prospects would be recommended for acquisition and which ones would be rejected. Appellant Quick, a real estate broker, was a friend of Shields.

In 1978, a Tallahassee real estate broker named Bruce McIver hoped to arrange the sale of two large parcels of land to the state. One tract was known as Seminole Ranch and the other as Big Talbot Long Island. In March, McIver solicited Quick to ask Shields to recommend him as a broker to the owners of the Seminole Ranch property. Quick arranged for McIver to meet with Shields, and Shields agreed to help McIver as requested. A few weeks later, McIver agreed to pay Quick $100,000 as a real estate commission if he obtained the right to sell the Seminole Ranch tract to Florida. He obtained that right in May and stood to make a $960,000 commission if the sale went through.

In August, the IAC met and voted to recommend to the governor and the cabinet that the state acquire Seminole Ranch. Shields' deputy in the Department of Natural Resources testified that Shields instructed him before this meeting to recommend to the IAC, on behalf of the Department, that the state purchase the property. A week after the meeting, Shields summoned McIver to his office and told him that he wanted McIver to hire an individual named John Tanner to show the Seminole property to an appraiser and to do other tasks related to selling the land. McIver agreed to do so.

In September, the governor and the cabinet agreed to accept the IAC's recommendation. Shortly thereafter, Quick informed McIver that Shields wanted half of McIver's commission on the Seminole Ranch sale. McIver resisted. Quick then warned McIver that Shields would stop the sale if McIver did not agree to make the payment, and Quick also announced that Shields had said that McIver's other project, Big Talbot Island, was "dead." The next few weeks saw a series of meetings between Quick and Shields and between Quick and McIver. Quick told McIver that Shields was demanding $200,000 when Seminole Ranch was purchased by the state and $35,000 when Big Talbot was acquired. McIver never talked directly with Shields about the demands conveyed to him.

The plot thickened when Quick hired a private detective, Gene Andrews, to help him get tape recordings of his conversations with Shields. Quick's purpose in wanting to record the conversations was to ensure that Shields would live up to his agreements on the land deals then taking place and to blackmail Shields to participate in future corrupt land deals or payoffs. Andrews told Quick that he probably could provide tape recording equipment to be worn on Quick's body. Subsequently, Andrews reported Quick's request to an FBI agent who instructed Andrews to agree to the request and said that the FBI would provide recording equipment.

On November 6, 1978, the FBI provided Andrews with two pieces of equipment: a body tape recorder and a radio transmitter. Andrews took the equipment to Quick's office. Quick removed his coat and vest and Andrews installed the tape recorder and the transmitter in a concealed position on Quick's body. Andrews told Quick to wear the transmitter so that Andrews could overhear the conversation as it was occurring so that he could come to Quick's assistance should Shields discover the bug. When Quick was ready to leave for his meeting with Shields, Andrews activated the tape recorder and taped the switch in the "on" position. Quick proceeded to Shields' office where their conversation was recorded. The FBI, but not Andrews, listened in on the conversation as it was received from the transmitter. When Quick returned to his own office, Andrews turned off the recorder, removed the recorder and the transmitter from Quick's body, and left. He then returned the equipment to the FBI. An FBI agent took the equipment to his office where he listened to the original tape and made two cassette copies. The agent later gave Andrews the copies, one to keep and one to give to Quick.

In the meeting which was recorded, Shields demanded half of the $100,000 which McIver had agreed to pay Quick. Shields complained that he was not getting enough money for the risk he was taking, and Quick assured Shields that McIver did

not know that Shields was to receive a portion of the money that McIver had agreed to pay Quick.

On November 14, Quick again recorded a conversation with Shields with equipment supplied and operated by Andrews. In this meeting, which took place in Shields' home, Quick told Shields that McIver was "desperate" because he was afraid that the purchase of Big Talbot Island would fall through. Shields told Quick that the Big Talbot Island property was not on the agenda for the IAC meeting the next day and that he intended to "try to help [McIver] with that" provided the appraisals of the land were satisfactory. Shields agreed to call his deputy in the Department of Natural Resources and instruct him that if the appraisal on Big Talbot was "in the ballpark," the IAC should recommend that the state purchase the property.

Sometime in November, 1978, McIver heard from Richard Pelham, his business associate, that Shields wanted $100,000 to facilitate the sale of Big Talbot Island. Pelham testified that Shields had asked him to give this message to McIver and had indicated the amount by a hand gesture. After receiving the message from Pelham, McIver met with Quick, told him of the message, and stated that he could not afford to pay Shields. During this conversation, McIver telephoned Shields and said he wanted to meet with him and discuss the message sent through Pelham. Shields responded that he would only meet with Quick.

Quick and McIver then drove to Shields' office building, and McIver waited in the car while Quick met alone with Shields. Thirty minutes later, Quick returned and told McIver that Shields wanted some money from him. McIver told Quick that he could not afford to pay Shields anything. Quick first suggested that McIver pay Shields $10,000 in $100 bills immediately. After further conversation, Quick asked if McIver could afford $25,000. McIver again responded that he could not pay Shields anything. Quick went again to Shields' office, returned, and told McIver that Shields

had said that unless McIver gave him $35,000 he would kill the Big Talbot Island sale before the IAC met again. Quick told McIver that the two were to drive off if McIver agreed to this demand, and they did so.

On December 14, 1978, the IAC met. The Committee voted to recommend Big Talbot Island to the governor and his cabinet for purchase by the state.

Quick and Andrews repeated their recording procedure on January 16, 1979. Andrews once again provided Quick with a body recorder and a transmitter, and conversations between Quick and Shields were recorded in Shields' office, his car, a restaurant, and a wooded area. FBI agents heard over their car radio the transmissions of the conversations made in the restaurant and in the woods. The conversation in the country took place because Shields was worried that the FBI was "damned sure on this case" and believed that the FBI might have placed a recording device in his office. Shields told Quick that they should no longer meet or converse over the telephone unless they had legitimate business to transact. After this meeting with Shields, Quick warned McIver that Shields had told him that the FBI was investigating the case. Quick then told McIver not to call Shields any more and not to tell any one about any requests for money.

Big Talbot Island and Seminole Ranch were never purchased by the State of Florida. After Florida newspapers learned of the FBI's investigation, the state stopped the purchase of all land under the program.

## II. Admissibility of the Intercepted Conversations

The government stipulated at trial that no warrant or other judicial authorization was ever issued for any of the interceptions of the conversations between Quick and Shields on November 6, November 14, and January 16. Appellant Shields claims that the interceptions were illegal and inadmissible under the Omnibus Crime Control Act. He further maintains that the evidence of the conversations should be suppressed on the grounds that the FBI agents violated

his fourth amendment rights by (1) playing and listening to the tapes which Andrews had given the agents and (2) intercepting Shields' conversations in his home, in his office, and elsewhere through the use of the radio transmitter. Because express consent to the FBI's actions was given only by Andrews, who was not a party to the conversations, this case raises difficult questions.

### A. The Omnibus Crime Control Act

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510–20 ("the Act") prohibits the electronic interception of "oral communications" except under certain circumstances and provides that the contents of conversations intercepted in violation of the Act may not be received in evidence in any court proceeding. *See* §§ 2511 amd 2515. The legality of the interceptions involved here turns on the construction and application of § 2511(2)(c), a consensual exception to the Act's broad proscriptions.[1] That subsection states:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Whether the requirements of § 2511(2)(c) were met thus depends upon (1) what acts constituted interceptions of the conversations between Quick and Shields, (2) who was responsible for each interception, (3) whether that person was acting under color of law, and (4) whether that person was a party to the communication or whether there was consent to the interception by a party.

The Act defines "intercept" as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Under this definition, each communication in question was intercepted twice. One "aural acquisition" occurred when the agents heard the conversa-

tion being transmitted by radio. The other involved the tape recording and occurred at the time the recording was made, not when persons listened to the tape. *United States v. Turk*, 526 F.2d 654, 658 (5th Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

In ruling on the motion to suppress, the district court determined that the tape recording was an interception by Andrews. That finding was based upon the district court's conclusion that "the recording ... equipment came to be on defendant Quick's person as a result of Quick's explicit request that Mr. Andrews assist him with acquiring such electronic paraphernalia as was necessary for Andrews to record said conversations." Appellant Shields argues, however, that Quick intercepted the conversations by making the tapes and that the evidence is inadmissible under § 2511(2)(c) because Quick was not acting under color of law.

■ The district court's determination of who intercepted the conversations was a finding of fact. As such, it must be upheld unless we find it clearly erroneous. *See generally* McCormick's Handbook of the Law of Evidence § 53 (2d ed. 1972).

■ We find that the record sufficiently supports the district court's view of the events. Andrews' testimony at the suppression hearing indicates that he, not Quick, controlled the recording equipment. Andrews installed the recorder, turned it on, and taped the switch in the "on" position. After the conversation, he removed the equipment and turned off the recorder. Though the recording was apparently done at Quick's request, and though Quick wore the recorder, Andrews did the recording. He used Quick's body as the means of inserting the equipment into the presence of the conversationalists; Quick's request would have been granted had Andrews arranged for the recorder's and the transmitter's presence in any other acceptable way.

■ Courts have repeatedly held that informants who tape-record private conversa-

---

1. The government does not argue that any other exceptions in the Act apply.

tions at the direction of government investigators are "acting under color of law" within the meaning of subsection (c). *See, e.g., United States v. Mendoza,* 574 F.2d 1373, 1377 (5th Cir.), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); *United States v. Ransom,* 515 F.2d 885, 889 (5th Cir. 1975), *cert. denied,* 424 U.S. 944, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *United States v. Craig,* 573 F.2d 455, 476 (7th Cir. 1977); *United States v. Rich,* 518 F.2d 980, 985 (8th Cir. 1975). Consequently, it seems clear—and Shields apparently admits—that Andrews was acting under color of law when he recorded the conversations here.

The remaining inquiry is whether Quick consented to the interception within the meaning of § 2511(2)(c). The legislative history explains the consensual exception as follows: "It shall not be unlawful for a party to any wire or oral communication or a person given prior authority by a party to a communication to intercept such communication." S.R.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. and Ad.News 2112, 2182. Since Andrews' activities were invited, he did have "prior authority" to make the interception.[2] Also,

the requirement that the consent be voluntary is satisfied in this case. *See United States v. Juarez,* 573 F.2d 267, 278 (5th Cir. 1978).

We find, then, that the recordings were legal interceptions and that the taped evidence of the conversations was admissible. We need not decide whether the interceptions through the reception of radio transmissions were legal.[3]

**B. The Fourth Amendment**

Appellant Shields contends that evidence of the content of his conversations with Quick should be excluded because the government violated his fourth amendment rights in two ways. First, with regard to the interception of the conversations, Shields maintains that his rights were violated when the FBI, without a warrant and without Shields' consent, acted through Andrews to place a transmitter and a recorder inside Shields' home, in his office, and in a field.

Contrary to the tone of Shields' argument, "the Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19

2. Obviously, as the government points out, a party to a conversation who has consented to its interception need not authorize further its being divulged. "If consent has been given prior to the original interception, no additional consent is necessary before the information can be used or admitted into evidence." J. Carr, The Law of Electronic Surveillance 91 (1977).

Nor does it matter that Quick was unaware that Andrews was cooperating with the FBI. As indicated by Supreme Court decisions in the context of fourth amendment claims, "consent is not vitiated merely because it would not have been given but for the nondisclosure or affirmative misrepresentation which made the consenting party unaware of the other person's identity as a police officer or police agent." W. LaFave,2 Search and Seizure 680 (1978).

3. Since we do not reach this question, we avoid a sticky issue of statutory interpretation, the meaning of "such interception" under § 2511(2)(c). The district court found, and the parties agree, that in the instance of each transmission of the defendants' conversations, there was an interception by the FBI agents who listened over the radio. As Shields points out, Quick did not expressly consent to this particular interception. He did, however, authorize the transmission of the conversations over the

airways and authorize Andrews to listen. He thus consented to *an* interception. The issue that would be raised by these facts is whether such consent is sufficient for the interception to be deemed legal under § 2511(2)(c). This issue might be seen as a question of how far Quick's consent extends. *See United States v. San Martin,* 469 F.2d 5, 7 (2d Cir. 1962).

One could argue that the legislative history quoted earlier suggests that the statute should be read to confer legality only upon an interception by the person authorized to listen or record. However, consent might be implied under the facts here. Andrews was authorized to listen and merely designated others to act for him. Since a party to the conversation consented to interception by a hidden listener, there was no intrusion into a conversation which was intended by both parties to be private. The policy grounds upon which § 2511(c)(2) was based would thus seem to be met. Also we note that these facts would be distinguishable from a situation where an unauthorized person listened in on a conversation without the consent of a person who had been authorized to listen, *i.e.,* where there were two distinct interceptions.

L.Ed.2d 576 (1967). The location of the conversations that were intercepted is not determinative; the proper inquiry is whether the government's activities in electronically listening to and recording the conversations violated privacy upon which Shields justifiably relied. *See id.* at 353, 88 S.Ct. at 512; *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

■ Supreme Court cases have consistently held that the government does not violate the fourth amendment by recording and transmitting private conversations with the consent of one of the parties, even though the other party does not know his conversation is being recorded or transmitted. *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). "The principle underlying them is that when one reveals information to an individual, one takes the risk that one's confidence in that individual is misplaced." *Flaherty v. Arkansas*, 415 U.S. 995, 999, 94 S.Ct. 1599, 1601, 39 L.Ed.2d 893 (1974) (Douglas, J., dissenting from denial of certiorari). Since the fourth amendment affords no protection "to a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it," *Hoffa v. United States*, 385 U.S. at 302, 87 S.Ct. at 413, the government's warrantless interceptions involved no violations of justifiable expectations of privacy. Those cases have arisen where a party was an informant or agent, a slightly different context than we have here. Nonetheless, they have focused on constitutionally justifiable expectations of privacy, as we must do, and they control this decision.

■ Here, Quick was in Shields' home and office with Shields' consent, if not his invitation. *Cf. Lopez v. United States*, 373

U.S. 427, 438, 83 S.Ct. 1381, 1387, 10 L.Ed.2d 462 (1963) (approving agent's recording of conversation in another's office). Quick, as party to the conversation, wore the recorder and the transmitter; the equipment was not placed on Shields' premises. Compare *United States v. Padilla*, 520 F.2d 526 (1st Cir. 1975) (disapproving recording of conversation with agent where microphone had been placed in hotel room). Shields knowingly placed his trust in Quick by conversing with him, taking the risk that Quick would not convey the content of the conversations to others either then or later. *See United States v. White*, 401 U.S. at 751–52, 91 S.Ct. at 1125–26. True, Quick did not expressly authorize an interception by government agents; however, Shields' contentions fare no better simply because his confidante instead authorized the interception of the conversation by a confederate who turned out to be a government informer. There was still no governmental intrusion into a conversation which was intended by both parties to be private. Under these circumstances, the government's interceptions did not violate Shields' justifiable expectations of privacy.

Shields also contends that the government violated his fourth amendment rights by the agents' playing and listening to the tapes which Andrews gave them without first obtaining a warrant. In support of his contention, Shields cites *United States v. Turk*, 526 F.2d 654 (5th Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), (plurality opinion), and *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).

In *Turk*, a tape recording of a conversation between Turk and another party was seized when the other party was lawfully arrested. The Fifth Circuit held that the warrantless playing of the tape by law enforcement officers after it was seized was improper.

Similarly, *Robbins* involved a warrantless opening of a closed paper bag found in the luggage compartment of a car which had

been stopped and was being lawfully searched. The court announced, in a plurality opinion, that the opening of the closed container violated the fourth and fourteenth amendments.[4]

*Walter* involved warrantless screening of obscene films which had been turned over to the FBI by a private party who had received the films through an innocent miscarriage of shipment. The court determined that the screening was an unreasonable search.

The case before us is fundamentally different from the cases cited by appellant Shields. In none of those cases did the government obtain consent to the search from anyone who had the right to control or use the item in question because of ownership or possession of the item with the knowledge of the owner. Other authority controls here.

The Supreme Court has upheld the validity of searches conducted upon the consent of a third party where that party has a sufficient relationship to the property which has been searched. *See Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969) (joint user of a dufflebag). In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Court explained that warrantless searches are constitutional where "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 172, 94 S.Ct. at 993. "The authority which justifies the third-party consent ... rests ... on mutual use of the property by persons generally having joint access or control for most purposes ...." *Id.* n.7.

█ Here, Andrews had the right to use the tape. He had supplied the taping equipment for Quick at Quick's request. He had recorded the conversation, and had purportedly taken the original tape with Quick's consent to make copies. Furthermore, Quick knew that Andrews had retained his own tape even after Quick had received his recording of each conversation. The interest which Andrews had in the tape was unquestionably sufficient to enable him to authorize the government's listening to the recorded conversation.

### III. The *Brady* Issue and Sufficiency of the Evidence

McIver was interviewed by the FBI on January 23, 1979, and appeared before a grand jury on January 25. He was later granted immunity, was interviewed again by the FBI in May and June, and appeared before a grand jury on June 7. Quick asserted that the FBI report of its initial interview with McIver constituted *Brady*[5] material to which he was entitled and without which he was denied fair trial. The district court, after examining the report *in camera*, refused to order the government to furnish the material.

Quick points out several specific areas in which both the initial grand jury testimony and the first FBI statements are inconsistent with McIver's trial testimony. The initial grand jury testimony was available to Quick and was used at trial for impeachment, but Quick contends that the FBI report was nevertheless necessary to his defense. He maintains that statements to the FBI are more thorough and lengthy than grand jury testimony, so that the report has greater weight. Quick further argues that because the tape recordings are subject to the interpretation that there was only a bribe involved,[6] the failure to order that the FBI's report be furnished to him cannot be harmless error.

---

4. When granting certiorari in *United States v. Ross*, 655 F.2d 1159 (D.C.Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 386, 70 L.Ed.2d 205 (1981), the Court directed the parties to address whether the Court should reconsider *Robbins*.

5. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

6. Under the theory on which this case was brought, McIver was the victim of extortion. It was Quick's defense, however, that McIver and Quick had conspired to bribe Shields and that there was no extortion involved.

# 1160

We reject Quick's contentions. As impeachment evidence, the statements to the FBI are cumulative with the initial grand jury testimony. After examining the content of the report, we do not believe that the statements could have been used to impeach McIver in any way that the defense did not already know about and have the opportunity to exploit. What was sought to be proven regarding credibility was proven. Since the appellants were properly allowed to show that McIver had given sworn inconsistent statements prior to the trial, the jury knew that McIver had persisted in a version of the transaction different from the version he gave after he was granted immunity. The mere fact that he had also given the earlier version to investigating agents would not have added a feather's weight to the impeachment effort. The district court's failure to have ordered disclosure, if error, was harmless since the report could not have "affected the outcome of the trial." *See United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). *See generally Monroe v. Blackburn,* 607 F.2d 148, 150 (5th Cir. 1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1979). Nonetheless, we are disappointed in the government's refusal to disclose the information upon Quick's specific request. We note that the *Brady* rule requires disclosure of all material evidence favorable to a defendant, and we caution the government that such materials should not be sparingly produced.

Finally, the appellants challenge the sufficiency of the evidence. After reviewing the record, we determine that the relevant evidence, viewed in the light most favorable to the government, could be accepted by a reasonably minded jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.[7] Accordingly, the convictions are

AFFIRMED.

---

7. *See generally United States v. Burns,* 597 F.2d 939, 941 (5th Cir. 1979) (discussing the formulations of the standard used to assess the sufficiency of evidence).