*David Glenn Seal v. State of Maryland*, No. 51, September Term, 2015, Opinion by Adkins, J.

**CRIMINAL LAW — MARYLAND WIRETAPPING AND ELECTRONIC SURVEILLANCE ACT — ACTING UNDER THE SUPERVISION OF AN INVESTIGATIVE OR LAW ENFORCEMENT OFFICER — SUPPRESSION OF EVIDENCE:** An individual does not act "under the supervision of an investigative or law enforcement officer" where the police merely set up recording equipment, instruct the victim on how to conduct the recording and give the individual the equipment to conduct the recording on his or her own in another state.

Circuit Court for Montgomery County
Case No.: 122857C
Argued: January 12, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 51

September Term, 2015

DAVID GLENN SEAL

v.

STATE OF MARYLAND

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Hotten,

JJ.

Opinion by Adkins, J.
McDonald, J., concurs.

Filed: March 28, 2016

Police access to communications over various networks plays a key role in many criminal investigations. A particularly important network is the telephone system. Surveillance of the telecommunications network, however, is heavily circumscribed by constitutional and statutory protections at both the state and federal level.[1] In this case, we are asked to interpret Md. Code (1973, 2013 Repl. Vol., 2015 Supp.), § 10-402(c)(2) of the Courts and Judicial Proceedings Article ("CJP")—an exception to the Maryland Wiretapping and Electronic Surveillance Act's general prohibition on the interception of wire, oral, and electronic communications.

## FACTS AND LEGAL PROCEEDINGS

Donald W. ("Donald")[2] is a 44-year-old man living in West Virginia. As a child, Donald lived with his mother Shanda Seal, and his stepfather, Mack Henry Seal, Jr. in Montgomery County, Maryland. The Petitioner in this case, David Seal ("Seal"), is the brother of Mack Seal and the step-uncle of Donald. Seal lived with his mother, Donald's step-grandmother, in Montgomery County.

During the summer of 1982, when he was ten years old, Donald spent multiple nights at his step-grandmother's house and would often sleep in the guest bedroom. He testified that he awoke one morning to "someone touching" his penis. When Donald woke fully, he saw Seal leaving the guest bedroom. Seal returned about five minutes later and

---

[1] Wayne R. LaFave, et al., Criminal Procedure § 4.5 (5th ed. 2009).

[2] Because Donald was a juvenile at the time of the alleged crime, we limit our description to the first initial of his last name.

began to fondle Donald's penis beneath his underwear. Donald was "scared" and "didn't know what to do."

Donald testified that the sexual abuse continued throughout the summer of 1982 in different rooms throughout the house and in a barn behind the house. Seal performed anal and oral sex on Donald, and had Donald perform oral sex on him. Donald stated that Seal even used the handle of a plunger to penetrate Donald's anus. Donald estimated that the abuse occurred between 10 and 20 times that summer. In addition, Donald testified that the abuse continued for several years thereafter, but ended "[c]lose to the end of sixth grade and the beginning of seventh grade."

Donald did not tell anyone about the abuse while it was occurring because he was "scared" and "afraid." Seal told Donald that he would hurt Donald's mother and brother if he reported the abuse. The first time Donald told anyone about the abuse was when he was 21 years old. Donald told his mother and stepfather. They were upset, but did not do anything about it. Donald did not contact the police or anyone else because he was embarrassed.

Years later, Donald told his current wife, Stacey, about the abuse. In approximately mid-2000, Stacey confronted Seal in the parking lot following a family member's funeral. Stacey asked Seal "why he did that to [Donald]" and told Seal that "he should be ashamed of himself." Seal responded that "the devil had a hold of him" and that he was "sorry for what he did."

A few years later, Donald telephoned Seal because the abuse had "been weighing heavy" on him. Donald asked Seal why he had abused him as a child. Seal repeated what

2

he had told Stacey and replied that "the devil got a hold of him." After speaking for approximately 20 minutes, Seal told Donald that he would call him back later. About a week later, Seal called Donald and apologized to him. He told Donald that he was sorry "if he ever did anything" and "was a changed man and he went to church." Seal offered to "make payments" to Donald and offered up to $7,000.00. Donald declined the financial offer from Seal.

On January 22, 2013, Donald went to the police station in Rockville, Maryland and met with Detective Tracey Copeland ("Copeland" or "Detective") of the Montgomery County Police. After telling Copeland about the abuse, Donald and Copeland tried to call Seal together "a couple of times that day" in an effort to engage Seal in a discussion of the abuse and elicit an admission or confession. These phone calls were unsuccessful. Donald and Copeland then decided that they would wait a couple of days before calling Seal again. At a hearing where the trial court considered Seal's motion to suppress, when asked what she told Donald, Copeland testified as follows:

> I showed him the equipment that I would be using, sort of gave him the process with respect to what we normally did in that type of monitored phone call and then proceeded to attempt to make the phone call.

Copeland met with Donald in Frederick, Maryland after the January 22 meeting and twice attempted a phone sting,[3] but they were never able to reach Seal. As a result, Copeland provided Donald with equipment that would enable him to record a telephone

---

[3] Copeland testified that they met in Frederick rather than Rockville so that Donald, a West Virginia resident, would not have to travel as far.

3

conversation with Seal.[4]  Copeland testified at trial that she "showed [Donald] the equipment that [she] utilize[d] in order to do the phone sting," and "made sure he understood how to work it" and "how to operate it."  After Donald returned to his home in West Virginia, he used the equipment to record a telephone call with Seal on February 5, 2013.  During this recorded call, Seal made multiple incriminating statements.  Copeland testified at the motions hearing that she did not monitor the conversation in live time.  After this phone call took place, Copeland met Donald in Frederick to retrieve the recording equipment.  Copeland then downloaded the recording onto a disc after she returned to her office.

At trial in the Circuit Court for Montgomery County, the February 5 recorded telephone conversation was played for the jury over defense counsel's objection.  The jury returned a guilty verdict on all counts: one count of child sexual abuse, four counts of third-degree sex offense, and six counts of second-degree sex offense.  Seal was sentenced to 15 years' incarceration for child sexual abuse, 15 years consecutive for one count of second-degree sex offense, and 15 years consecutive for a second count of second-degree sex offense.  Concurrent sentences were imposed for the remaining counts.

Seal appealed to the Court of Special Appeals and maintained that the Circuit Court erred in denying his motion to suppress the February 5 telephone conversation that was

_____

[4] Copeland described the recording equipment as a "digital recorder" that is "sort of" like a tape recorder without the tape.  She testified that the recording equipment includes a microphone that is placed in the caller's ear that can record both their voice and the voice on the end of the line.

played for the jury at trial.[5]  In an unpublished opinion, the intermediate appellate court, in a split decision, affirmed the Circuit Court's denial of Seal's motion to suppress and upheld the conviction.  The Court of Special Appeals ruled that Copeland sufficiently supervised Donald so as to make the recording a permissible interception under CJP § 10-402(c)(2).  Seal timely appealed and we granted his Petition for Writ of Certiorari.  Seal presented the following two questions for review:

> (1) When a Maryland law enforcement officer provides a West Virginia resident with a recording device to be used at the resident's pleasure, does use of the device constitute "acting . . . under the supervision of a . . . law enforcement officer" pursuant to the Maryland Wiretap Statute?

> (2) Does Maryland's wiretapping statute authorize a Maryland law enforcement officer to provide a West Virginia resident with an electronic device to be used by the West Virginia resident, two weeks later, to record telephone conversations with a Virginia resident and use those recordings in a criminal proceeding in Maryland?

We hold there was no supervision, thus answering no to the first question.  We shall reverse the judgment of the Court of Special Appeals.  Therefore, we need not address the territorial argument presented by the second question.

**STANDARD OF REVIEW**

In reviewing a trial court's denial of a motion to suppress evidence, "we view the evidence presented at the [suppression] hearing, along with any reasonable inferences drawable therefrom, in a light most favorable to the prevailing party."  *Davis v. State*, 426 Md. 211, 219, 43 A.3d 1044, 1048 (2012).  We accord deference to the fact-finding of the

---

[5] Seal also appealed his conviction on several other grounds not relevant here.

trial court unless the findings are clearly erroneous. *Bailey v. State*, 412 Md. 349, 362, 987 A.2d 72, 80 (2010). We give no deference, however, to the question of whether, based on the facts, the trial court's decision was in accordance with the law. *Crosby v. State*, 408 Md. 490, 505, 970 A.2d 894, 902 (2009).

When interpreting a statute, a court's goal is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied." *Ray v. State*, 410 Md. 394, 404, 978 A.2d 736, 747 (2009) (citations and internal quotation marks omitted); *see Rush v. State*, 403 Md. 68, 97, 939 A.2d 689, 706 (2008) ("[T]he cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature.") (citations and internal quotation marks omitted). We must begin with the well-established canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. *Ray*, 410 Md. at 404, 978 A.2d at 747–48. If the language is clear and unambiguous on its face, that is the end of our inquiry. *Id.* at 405, 978 A.2d at 748. If, however, the language is ambiguous, we move on to examine case law, the structure of the statute, statutory purpose, and legislative history to aid us in ascertaining the intent of the General Assembly. *Id.* (citations omitted). Additionally, statutes "should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory." *Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302, 783 A.2d 667, 671 (2001).

## DISCUSSION

The Maryland Wiretapping and Electronic Surveillance Act ("Maryland Wiretap Act" or "Act") makes it unlawful to "[w]illfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic

6

communication." CJP § 10-402(a)(1). Whenever one unlawfully intercepts such a communication, it is inadmissible in any court proceeding. CJP § 10-405. Notably, the Act carves out several exceptions. We have explained that the procedures underlying the Maryland Wiretap Act and its exceptions must be strictly followed. *See State v. Siegel*, 266 Md. 256, 274, 292 A.2d 86, 95 (1972) ("The statute sets up a strict procedure that must be followed and we will not abide any deviation, no matter how slight, from the prescribed path.").

The exception found in CJP § 10-402(c)(2) is the only one that is pertinent to this appeal. This exception provides that "it is lawful . . . for an investigative or law enforcement officer acting in a criminal investigation or **any other person acting at the prior direction and under the supervision of an investigative or law enforcement officer** to intercept a wire, oral, or electronic communication in order to provide evidence" of an offense listed in § 10-402(c)(2)(ii)(1). CJP § 10-402(c)(2)(ii) (emphasis added). We shall refer to this as the "supervision exception."

"A sexual offense in the first or second degree"; "[c]hild abuse in the first or second degree"; and "[s]exual abuse of a minor under § 3-602 of the Criminal Law Article" are among the crimes that are included in the supervision exception. *See* CJP § 10-402(c)(2)(ii)(1)(D), (E), (R). The supervision exception is only available when "[t]he investigative or law enforcement officer or other person is a party to the communication" or "[o]ne of the parties to the communication has given prior consent to the interception." CJP § 10-402(c)(2)(i).

Here, the central point of contention between the parties is whether Donald was acting "under the supervision of an investigative or law enforcement officer" as required by the statute. CJP § 10-402(c)(2)(ii).[6] Seal argues that the call was not recorded under the supervision of Copeland because all she did was give Donald the recording equipment with limited instructions about how to operate it. The State, however, relies on case law interpreting the federal wiretap statute as support for a broad reading of the word "supervision" in the Maryland Wiretap Act.

### Federal vs. Maryland Consent to Taping Law

The Maryland Wiretap Act restricts one-party consent to those situations in which an investigative or law enforcement officer acting in a criminal investigation, or any other person "acting at the prior direction and under the supervision of" such an officer, intercepts a communication. CJP § 10-402(c)(2). The Act otherwise requires the consent of all parties to a communication under its consent provision. CJP § 10-402(c)(3). The federal wiretap statute is less restrictive in two respects. First, it allows "a person acting **under color of law** to intercept a wire, oral, or electronic communication . . . ." 18 U.S.C. § 2511(2)(c) (emphasis added). Second, it allows individuals to record any phone call they

---

[6] Seal presents no challenge to the other requirements to meet the supervision exception. He does not contest that Detective Copeland was an investigative or law enforcement officer, or that Donald was a "party to the communication," both as required by the Maryland Wiretapping and Electronic Surveillance Act ("Maryland Wiretap Act" or "Act"). *See* Md. Code (1973, 2013 Repl. Vol., 2015 Supp.), §§ 10-401(11), 10-402(c)(2)(i) of the Courts and Judicial Proceedings Article ("CJP"). Nor does Seal argue that acts he allegedly committed fall outside the range of crimes for which the interception of wire, oral, or electronic communications are permitted. Finally, Seal does not challenge that Donald acted at the "prior direction" of law enforcement. The only issue in this case is whether Donald was acting "under the supervision" of Detective Copeland.

8

are party to, **without government involvement**, so long as their purpose is not to commit a criminal or tortious act. *Id.* § 2511(2)(d) (emphasis added). So the "color of law" language in the federal statute is less meaningful than the Maryland supervision exception because it co-exists with the permissive one-party consent provision.

We have explained that the two-party consent provision of the Maryland Wiretap Act is "a departure from the federal act" and is "aimed at providing greater protection for the privacy interest in communications than the federal law." *Mustafa v. State*, 323 Md. 65, 70, 74, 591 A.2d 481, 483, 485 (1991).[7] Indeed, we have recognized that the provisions of the Maryland Wiretap Act constitute a declaration of the public policy of this State. *Id.* at 74, 591 A.2d at 485. In explaining its importance and history we stated:

> The requirement of consent by *all* parties for the recording of a telephone conversation by a private individual has been a fundamental part of Maryland law since at least 1956, and the one attempt by the Legislature, in 1973, to modify that provision met with a veto in which the Governor expressed his deep concern that the "opportunity for unwarranted spying and intrusions on people's privacy authorized by this bill is frightening." *See* 1973 Md. Laws, Vol. II, at 1925. Under long-standing Maryland law, therefore, a party to a telephone conversation does *not* take the risk that another party, not acting as, or under the direction of, a government agent, will record and divulge the contents of the conversation[.]

*Perry v. State*, 357 Md. 37, 61, 741 A.2d 1162, 1175 (1999) (emphasis in original) (footnote omitted). The "departure" by the Maryland Wiretap Act in the consent

---

[7] In *Mustafa v. State*, 323 Md. 65, 591 A.2d 481 (1991), we refused admission of the contents of an electronically recorded telephone conversation, which was recorded legally in the District of Columbia, but in a fashion illegal under the Maryland Wiretap Act.

exception—"the most important exception" in wiretap statutes, *cf.* Wayne R. LaFave et al., *Criminal Procedure* § 4.6(l), at 309 (5th ed. 2009)—demonstrates a clear legislative intent that Maryland law afford greater privacy than does the federal wiretap statute.[8]

Section 10-402(c)(2), allowing one "acting at the prior direction and under the supervision of an investigative or law enforcement officer" to intercept an electronic communication is, as Seal contends, "purposefully specific." As Seal observes, when originally introduced, the bill proposing what is now CJP § 10-402(c)(2), used the same "under color of law" language as does the federal statute. Wiretapping and Electronic Surveillance Act, 1977 Md. Laws, ch. 692, 2798, 2807–08. But before passage, this language was excised in favor of the language found in the statute's present form. *Id.* The comment accompanying this change explained that it was intended to change the "rather vague reference from 'person acting under color of law' to more concrete reference to investigative or law enforcement officers or their agents." Amendments to Senate Bill by the Committee on Constitutional and Public Law, S.B. 175 (1977).[9]

---

[8] The Maryland Wiretap Act also affords more privacy than the federal statute in its treatment of prior judicial authorization. The federal act states that a court "**may**" require reports "showing what progress has been made toward achievement of the authorized objective and the need for continued interception." 18 U.S.C. § 2518(6) (emphasis added). On the other hand, the Maryland Wiretap Act states that a court "**shall**" require these periodic reports. CJP § 10-408(f) (emphasis added). This is one illustration of how "[l]ess discretion is allowed under the [Maryland Wiretap Act] than under [the federal statute] in the performance of certain procedures by the issuing judge." *See* Marianne B. Davis & Laurie R. Bortz, Comment, *The 1977 Maryland Wiretapping and Electronic Surveillance Act*, 7 U. Balt. L. Rev. 374, 388 (1978).

[9] *See also* Davis & Bortz, *supra* note 8, at 386–87 ("Rather than using the possibly ambiguous terminology 'person acting under color of law,' the new Maryland statute

The State maintains that there "is nothing to suggest that this language revision in the bill was intended to narrow the class of people that could permissibly intercept communications under this provision of the Maryland Wiretap Act." The General Assembly may not have intended to narrow the class of persons who could record private conversations they had with others, but clearly it expressed an intent that the State maintain control over such recording in some respect. Although we do not see it as necessary that the State monitor each recorded call, we do not share the State's view that the amendment substituting "direction and supervision" for "color of law" was essentially meaningless.[10]

### Court of Special Appeals Decision and Federal Cases

The State contends that we should rely on federal cases interpreting the meaning of "color of law" under the federal statute because Maryland's use of "supervision" is "subject to more than one interpretation." The Court of Special Appeals, accepting this argument, relied on several federal cases "that demonstrate just how little oversight is required by law enforcement to constitute a permissible interception" under the supervision exception. *Seal v. State*, No. 1430, 19 (Md. Ct. Spec. App. May 13, 2015) (citing *United States v. Andreas*,

---

clearly delineates those persons who may intercept under such circumstances, limiting the scope of such interceptions to the enumerated felonies in section 10-402(c)(2).").

[10] We also find unconvincing the State's reliance on "dicta in a dissenting opinion" by a former member of this Court as evidence that "acting under color of law" is sufficiently analogous to "acting at the prior direction and under the supervision of an investigative or law enforcement officer." *See Davis v. State*, 426 Md. 211, 236–37 n.3, 43 A.3d 1044, 1059 n.3 (2012) (Bell, C.J., dissenting). Rather than expounding on the meaning of "acting under color of law" or "acting at the prior direction and under the supervision of," the dissenting judge was, as the State acknowledges in its brief, "discussing the *differences* between the federal act and the Maryland Wiretap Act." (Emphasis added.)

11

216 F.3d 645 (7th Cir. 2000); *In re High Fructose Corn Syrup Antitrust Litig.*, 216 F.3d 621, 623 (7th Cir. 2000); *United States v. Haimowitz,* 725 F.2d 1561 (11th Cir. 1984); *Archer Daniels Midland Co. v. Whitacre*, 60 F. Supp. 2d 819 (C.D. Ill. 1999)).

Seal would have us reject the federal cases relied on by the intermediate appellate court, and instead focus on the plain meaning of the language in the Maryland statute—"at the direction" and "under the supervision" of law enforcement. He posits that the "determinative inquiry" is "whether [Donald] was **acting under the supervision** of Detective Copeland who simply handed him a digital recorder, with no instructions or limitations, to take home to West Virginia and use at his pleasure to tape conversations." (Emphasis added.) His answer to the inquiry is emphatically "no" and he asks us to reject, as a matter of law, the conclusion of the Circuit Court that "the supervision of the investigative law enforcement officer . . . was still in existence. It would remain in supervision until the officer said no more calls and took the equipment away."

Although a study of federal cases interpreting the "color of law" requirement of 18 U.S.C. § 2511(2)(d) is useful to our general understanding of the competing interests involved when a private citizen records telephone conversations with another, we do not tether our analysis as closely to these cases as did the Court of Special Appeals. In the absence of any Maryland cases interpreting the "under the supervision of" requirement, we examine the federal cases.[11]

---

[11] Most state wiretap statutes are patterned after 18 U.S.C. § 2511(2)(d) and use the phrase "under color of law." Some states, however, use the phrase "acting under the direction of an investigative or law enforcement officer," but do not include the word "supervision." *See, e.g.*, Fla. Stat. Ann. § 934.03(2)(c), discussed *infra*. The only other

12

*Whitacre*, relied on by the intermediate appellate court, is an example of how loosely the federal courts have interpreted "color of law." There, the federal district court admitted an unreliable informant's[12] taped conversations with a third party over a two-and-a-half-year period, even though the tapes showed signs of tampering and erasure, the informant did not follow the Federal Bureau of Investigation's ("FBI") policy on recording, and there were long gaps of time between the time of recording and the FBI took possession of the recording. We do not find the federal district court's decision consistent with the Maryland statute's clear "supervision" requirement. The presence of erasures, tampering, and long gaps of time before the FBI taking possession of the recording are all inconsistent with the notion of "supervision."

Nor do the other federal cases relied upon by the State and the intermediate appellate court justify the conclusion that, in this case, Donald acted "under the supervision of" the Detective. Each of these cases frames the inquiry into whether one is "acting under color of law" as whether an individual is acting at the "direction" of the government. *See Andreas*, 216 F.3d at 660 ("[W]hen assessing whether someone acted under 'color of law'

---

state to use the "under the supervision of" language in its wiretap statute is Delaware. The Delaware wiretap statute makes it lawful "for an investigative or law-enforcement officer acting in a criminal investigation or any other person acting at the prior *direction and under the supervision* of an investigative or law-enforcement officer" pursuant to an *ex parte* court order authorizing interception of communications in order to provide evidence of certain enumerated crimes. *See* Del. Code Ann. tit. 11, § 2402(c)(3) (West, Westlaw through 80 Laws 2016, ch. 202) (emphasis added). There is no case law, however, interpreting this phrase as it is used in the Delaware wiretap statute.

[12] The informant had failed two polygraph examinations, and he was indicted for embezzling money from Archer Daniels Midland Company. *Archer Daniels Midland Co. v. Whitacre*, 60 F. Supp. 2d 819, 829 (C.D. Ill. 1999).

for the wiretap statute, the question is whether the witness was acting under the government's **direction** when making the recording.") (emphasis added); *United States v. Shields*, 675 F.2d 1152, 1156–57 (11th Cir. 1982) ("Courts have repeatedly held that informants who tape-record private conversations at the **direction** of government investigators are 'acting under color of law . . . .") (emphasis added); *Obron Atl. Corp. v. Barr*, 990 F.2d 861, 864 (6th Cir. 1993) ("As to the second prong of the § 2511(2)(c) exception, '[c]ourts have established that informants who record private conversations at the **direction** of government investigators are "acting under color of law."'") (emphasis added) (quoting *Haimowitz*, 725 F.2d 1561, 1582 ("[T]he question in this case is whether [the informant] was acting at the **direction** of the government when he recorded the conversations.") (emphasis added)). None of these courts analyzes the meaning of "supervision."

In *Andreas*, the U.S. Court of Appeals for the Seventh Circuit determined that the following facts were sufficient to constitute surveillance "at the direction" of the FBI:

> FBI agents requested [the informant] begin taping his coconspirators, instructed him on what type of conversation to record, supplied him with taping equipment and tapes, instructed him on the proper use of the equipment and **met with him regularly** to discuss developments in the conspiracy and collect the tapes. When possible, **the FBI itself monitored** the conversations by setting up remote-controlled video recorders to tape the face-to-face meetings of the conspirators and having FBI agents act as hotel staff to infiltrate the meetings.

216 F.3d at 661 (emphasis added). Regular meetings with the informant and remote-controlled monitors are decidedly more "supervision" than we have in this case.

14

In *Shields*, 675 F.2d at 1157, the U.S. Court of Appeals for the Eleventh Circuit held that a private detective was "acting at the direction" of government investigators when he recorded conversations at the request of one of the defendants. The private detective told the FBI about the defendant's request and the FBI instructed the detective to accede to the defendant's request. *Id.* at 1154. The FBI then provided the private detective with "a body tape recorder and a radio transmitter." *Id.* The court noted that the FBI listened in on the conversations as they were received from the transmitter during the recordings. *Id.* at 1154–55. We would consider a police officer who listens to the conversations in "real time" to be supervising the person consenting to the recording. This is sufficient, although not necessary, police oversight to meet the supervision exception.

The U.S. Court of Appeals for the Sixth Circuit excused a lack of direct supervision by the government over wiretapped recordings in *Obron Atlantic Corp.*, reasoning:

> The compelling and undisputed evidence of *continuous, albeit irregular, contact between Owen and the DOJ* [Department of Justice] *attorneys*, following their explicit request that he assist them in this very way and their instructions on how to conduct the calls, outweighs the lack of direct DOJ supervision over the recording process and Owen's failure to comply with certain directives.

990 F.2d at 865 (emphasis added). What the State downplays is that in each of these three cases, unlike this case, law enforcement maintained significant contact with the individual conducting the wiretapped surveillance.[13] As aptly expressed by Judge Raker in her

_____

[13] Additionally, it is not clear that the federal courts interpret the phrase "under color of law" as broadly as the State suggests. In *Thomas v. Pearl*, the court held that an assistant basketball coach at a state university was not acting under color of law for purposes of exception to liability under the federal wiretapping statute and recognized that "under color

dissenting opinion in the Court of Special Appeals in this case,[14] the federal courts held that the individual was acting at the direction of the government, and thus "under color of law," because "the government was monitoring the progress of the surveillance, in some form or another." *Seal*, No. 1430, at 3 (Raker, J., dissenting). We have none of that here. Neither rules nor guidelines were established by the Detective and we have no evidence that the officer made any effort to contact Donald after he left the police station.

Here, the trial court treated the hand-over of the equipment as equivalent to supervision, considering that "[i]t would remain in supervision until the officer said no more calls and took the equipment away." But the officer set no limit, restriction or requirement on the:

- Number or frequency of calls;
- Time of day or duration of calls;
- How or when to report back to police;
- Remote monitoring of calls by police;
- How long Donald could retain the equipment;
- Inquiry about other criminal matters; or
- Maintaining a log of calls made.

The police receive training regarding statutory restrictions and individual statutory and constitutional rights, which guides them in supervising individuals like Donald, and directing them how and when to make the calls using the government equipment, and when

---

of law" in the wiretap statute is narrower than "under color of state law" in the Civil Rights Act of 1871, 42 U.S.C. § 1983. 998 F.2d 447, 450–51 (7th Cir. 1993) ("[N]early all decisions have been quite careful to restrict their generous definitions of color of law to the civil rights arena.").

[14] Judge Raker sat on the Court of Special Appeals panel hearing this case as a specially assigned retired judge.

to cease those calls. It is this expertise that the General Assembly likely had in mind in requiring that only when private citizens were under police supervision could they use electronic recording devices to record conversations with others. With no instruction about limitations on use of the equipment, or when to report back to the officer, and with no contact between Donald and the officer during the time he retained the equipment, the police clearly did not supervise, monitor, or consider any of these individual interests. We reject the State's argument that "it can be *presumed* that the Detective informed the victim about how long to use, and when to return the equipment as the victim promptly returned the device to the detective after recording only one call with Seal." (Emphasis added.) The Detective testified, and did not say anything about instructions given to Donald regarding either how long to use, or when to return, the equipment.

Here, the Detective provided Donald with recording equipment so he could conduct the recording himself in his home state of West Virginia. In contrast to the FBI in *Shields*, 675 F.2d at 1154–55, the detective did not listen in on the conversation as it took place. There was no contact between the Detective and Donald for at least two weeks and it was not until after Donald used the equipment to record a conversation with Seal that the Detective came into contact with the victim to retrieve the recording. As illustrated by *Andreas*, *Shields*, and *Obron Atlantic Corp.*, even case law interpreting the less restrictive federal wiretap statute requires *some* form of contact between law enforcement and the individual conducting the recording to be sufficient to constitute surveillance "at the direction" of the government.

17

To be clear, we do not hold that law enforcement must be present or listening remotely at the time of the recordings. *See Andreas*, 216 F.3d at 661; *Obron Atl. Co.*, 990 F.2d at 865. Neither do we hold that there can never be a two-week gap between communications when the police are supervising a person who is taping conversations. We are mindful of the fact-specific nature of the inquiry involved. But here we see a *complete absence* of supervision. When all of the above facts are considered in the aggregate, it becomes clear that there was no supervision at all. *Cf.* Black's Law Dictionary 1667 (10th ed. 2014) (defining supervision as "[t]he series of acts involved in managing, directing, or overseeing persons or projects").

The State argues that we must consider "that the length of the surveillance and the number of interceptions in *Andreas* (30 months/120–130 tapes) and *Obron* (over two years/over 100 conversations) was much more significant than this case (two weeks/one conversation)." True, "there was the need and opportunity for more oversight in *Andreas* and *Obron*" than in this case, but there must at least be some oversight and here there was none.

In denying Seal's motion to suppress the recording, the trial court concluded:

> [T]he victim was acting at the direction of the officer—the officer had set up the equipment, told him what to do—and that the supervision of the investigative law enforcement officer . . . was still in existence. It would remain in supervision until the officer said no more calls and took the equipment away. There's no requirement under the statute that the officer be present during the call.

The Detective "sort of [giving Donald] the process" as to what the police do in a monitored phone call and showing him how the equipment works do not constitute supervision within

18

the meaning of § 10-402(c)(2). Judge Raker, dissenting from the Majority opinion, rightly

observed:

> Under the trial court's standard, law enforcement officers would have no obligation to follow-up or monitor the progress of the surveillance so long as the police set up the equipment, instruct the victim or informant on how to conduct the recording and give the individual the equipment to conduct the recording on his or her own.

*Seal*, No. 1430, at 6 (Raker, J., dissenting). The detective's actions do not comport with a

reasonable interpretation of the requirement of supervision by a law enforcement officer

and the State's interpretation of "supervision" contravenes the General Assembly's intent

of providing significant privacy protection through the Maryland Wiretap Act.

Accordingly, the trial court erred in admitting the taped telephone call between Donald and

Seal.[15]

---

[15] We are unpersuaded by the State's pointing to *Pope v. State*, 284 Md. 309, 396 A.2d 1054 (1979), to help define supervision. In *Pope*, a baby died from physical injuries inflicted by his mother, who poked, squeezed, shook, and beat him while in the grip of a "'religious frenzy.'" 284 Md. at 313–15, 396 A.2d at 1058–59. The mother's abuse occurred in Pope's presence and at her home, where the mother and infant were temporarily staying. *Id.* The Court reversed Pope's conviction for child abuse under former Article 27, Section 35(A)(a) of the Maryland Code because she did not have responsibility for supervision of the child. *Id.* at 325, 396 A.2d at 1064. The State quotes language from that opinion indicating that "'supervision' emphasizes broad authority to oversee with the powers of direction and decision." *Id.* at 323, 396 A.2d at 1063 (citing American Heritage Dictionary of the English Language (1969); Webster's Third New International Dictionary (1968)). Because *Pope* is "not directly on point" as the State acknowledges, we are not convinced that it "is instructive when it comes to defining supervision."

*Pope* was decided under the terms of a child abuse statute which required that a person be responsible for supervising a minor before she could be guilty of the crime of child abuse. Generally, to be responsible for supervising a child, a non-parent must have been granted that authority by the child's parents. *Pope*, 284 Md. at 323–24, 396 A.2d at 1063. The Court held that the defendant was not responsible for supervision of the child because the mother was always present and Pope's mere acts of kindness in taking the

We are not persuaded otherwise by a Florida intermediate appellate court decision, *Mead v. State*, 31 So. 3d 881 (Fla. Dist. Ct. App. 2010), relied on by the State. *Mead* is unpersuasive because Florida's wiretap statute is strikingly different than Maryland's Wiretap Act. Florida's wiretap statute provides in relevant part: "It is lawful . . . for an investigative or law enforcement officer or a person **acting under the direction of an investigative or law enforcement officer** to intercept a wire, oral, or electronic communication when . . . the purpose of such interception is to obtain evidence of a criminal act." Fla. Stat. Ann. § 934.03(2)(c) (West, Westlaw through 2016 2d Reg. Sess.) (emphasis added). Although Florida's wiretap statute, like Maryland's, uses the word "direction," the word "supervision" is conspicuously absent. Accordingly, an examination of a Florida case interpreting the meaning of "under the direction of an investigative or law enforcement officer" as that phrase is used in Florida's wiretap act would be inapt.

Finally, the State claims that concluding that the Detective did not supervise Donald within the meaning of CJP § 10-402(c)(2) would "severely restrict law enforcement's ability to utilize this exception to the Maryland Wiretap Act." The State warns that such a conclusion would make CJP § 10-402(c)(2) more burdensome than law enforcement's interception of communication without the consent of any party through obtaining an *ex*

---

mother and child into her home did not constitute an assumption of responsibility. *Id.* at 330, 396 A.2d at 1067. The Court's statement that "'supervision' emphasizes broad authority to oversee with the powers of direction and decision" does not lend support to the State's argument because there is no doubt that the Detective had the authority to oversee, with the powers of direction and decision, Donald's use of the recording equipment during the period he possessed it. The question here, rather, is whether the Detective actually exercised her broad power over the use of that equipment.

*parte* court order pursuant to CJP § 10-408. Section § 10-408(f) requires that when a judge issues an *ex parte* wiretap order, "the order shall require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. The reports shall be made at the intervals the judge requires." The State complains that a cooperating witness may have to report to law enforcement more often than affiants to a wiretap application have to report to the supervising judge. This is not a prescient warning because our decision is made on the record of this case, where the police did naught in the way of supervision. To meet the supervision requirement, there must be *something* more than the police instructing the victim on how to mechanically handle the recording equipment, making some unsuccessful calls in the station, and then handing over the equipment to the victim to record on his or her own.

### Conclusion

The use of wiretaps by law enforcement is an important pre-arrest investigative procedure. The General Assembly has subjected wiretapping to substantial legal regulation notwithstanding its importance to police in conducting an investigation of criminal activity. Our conclusion that Donald was not acting "under the supervision of an investigative or law enforcement officer" as required by CJP § 10-402(c)(2) is in accord with the Maryland Wiretap Act's strict limitations on the use of devices to intercept oral communications. Because the Maryland Wiretap Act "sets up a strict procedure that must be followed," *Siegel*, 266 Md. at 274, 292 A.2d at 95, we conclude that the trial court erred in admitting the taped telephone call between the victim and Seal.

21

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS TO BE PAID BY RESPONDENT.**

Circuit Court for Montgomery County
Case No.: 122857C
Argued: January 12, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 51

September Term, 2015

DAVID GLENN SEAL

v.

STATE OF MARYLAND

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Hotten,

JJ.

Concurring Opinion by McDonald, J.

Filed: March 28, 2016

I join the Court's judgment because I agree with the result. Although the Majority opinion expresses its rationale well, I would reach that result for a different reason.

As the Majority opinion explains, in order for the recorded undercover phone calls between Donald and Mr. Seal to be admissible in a Maryland court, Donald had to be making the calls at the prior direction, and under the supervision, of a law enforcement officer. At a minimum, then, there must be a law enforcement officer *acting in a law enforcement capacity* supervising the calls.

In my view, it is not necessary in this case to undertake the difficult assessment of how much supervision is sufficient in the myriad types of cases that might arise under this exception in the wiretap statute – inevitably, the analysis will be described as "case by case." In this case, however, the simple fact is that Donald made the undercover calls from West Virginia to Virginia and, as best I can tell from the record, no one with authority to function as a law enforcement officer in West Virginia was supervising those calls in any fashion.

Detective Copeland is a Montgomery County police officer. As such, she is authorized to act as a law enforcement officer in Montgomery County and, with certain limitations not relevant here, to conduct investigations throughout the State of Maryland. *See* Maryland Code, Criminal Procedure Article ("CP"), §2-102. She may also be able to exercise law enforcement powers in other states in particular circumstances, to the extent authorized by Maryland law and by the law of the other state.[1] But nothing in the record

---

[1] Maryland law allows county police officers to perform law enforcement duties outside Maryland in certain circumstances. *See, e.g.,* CP §2-105 (county police officers

indicates that Detective Copeland was authorized to do so in this case or that she otherwise had authority to supervise a criminal investigation in West Virginia. Thus, even if she was standing over Donald's shoulder the entire time he made the calls, he would not have been acting under the supervision of a law enforcement officer.[2] Nor is there any indication in the record that any law enforcement officer in West Virginia was involved in the investigation.[3]

Law enforcement officers are entrusted with special powers to enforce the law in our society – no doubt one reason that the Maryland Wiretap Act requires supervision by a law enforcement officer in order for the recording of a telephone call to be lawful in these

---

may act "outside the State" under mutual aid agreements). Presumably, the laws of other states allow Maryland officers to act as law enforcement officers in those states under particular circumstances, just as the law of Maryland allows officers from other states to carry out law enforcement duties here under particular circumstances. *See, e.g.,* CP §2-305 (police officers of other states may make arrests in Maryland when in "fresh pursuit" of suspect). But I am not aware of any law that generally authorizes law enforcement officers of one state to perform law enforcement functions in other states. For example, unless specifically authorized by Maryland and West Virginia law, Detective Copeland could not on her own obtain, and execute, a search warrant in West Virginia.

[2] Imagine if Donald had been making the calls from another state that ordinarily requires two-party consent and that lacks an exception for the particular crime under investigation. Even if Detective Copeland was physically present at the time of the undercover calls, she and Donald would likely both be violating the law of that state.

[3] The State relies on Maryland Code, Courts & Judicial Proceedings, §10-405(b), under which a telephone call intercepted in another state may be admissible in a Maryland court if the call was intercepted in compliance both with the law of that jurisdiction and with the Maryland Wiretap Act. But this does not mean that the requirement in the Maryland Wiretap Act that an undercover call be supervised by a law enforcement officer could be satisfied by someone without law enforcement authority in the jurisdiction of the interception.

circumstances.  But, for the same reason, it is important to recognize the bounds of those powers and to adhere to them.