*John Michael Ingersoll, Jr. v. State of Maryland*, No. 1477, September Term 2021. Opinion by Zic, J.

**CRIMINAL LAW – EXPERT TESTIMONY – LAW ENFORCEMENT OFFICER TESTIFYING AS EXPERT ON GANGS**

The circuit court did not abuse its discretion in allowing a correctional officer lieutenant to testify as an expert in gangs. The officer had extensive knowledge of and training and experience with gangs and their members.  Expert testimony is governed by Md. Rule 5-702, which requires an expert to be qualified by knowledge, skill, experience, training, or education; the expert testimony to be appropriate on the particular subject; and the expert's testimony is supported by a sufficient factual basis.  *See Covel v. State*, 258 Md. App. 308, 329 (2023).  In *Rochkind v. Stevenson*, 471 Md. 1 (2020), the Supreme Court of Maryland extended the U.S. Supreme Court's standard in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) to qualify expert witnesses under Md. Rule 5-702.

Here, the circuit court correctly allowed the officer to testify as an expert based on the non-exclusive *Daubert-Rochkind* factors.  In this case, the officer was deemed to be a reliable expert because of his years of training in gangs, experience with gangs and their members, and knowledge of the history, hierarchy, and practices of gangs.

**CRIMINAL LAW – LAW ENFORCEMENT OFFICER TESTIFYING AS EXPERT ON GANGS – PROBATIVE VALUE**

The probative value of expert testimony must not be substantially outweighed by any unfair prejudice to the defendant under Md. Rule 5-403.  In *Gutierrez v. State,* 423 Md. 476 (2011), the Supreme Court of Maryland held that the State must demonstrate, as a threshold matter, a nexus between the crime and the gang membership through fact evidence.  Here, the circuit court correctly found that the officer's testimony as an expert created a nexus between the appellant's gang membership and his motive to commit the crime. It likewise did not err in balancing the probative value of that evidence against its prejudicial impact.

**MARYLAND WIRETAP ACT – LAW ENFORCEMENT SUPERVISION**

Under Cts. & Jud. Proc. § 10-402(c)(2)(ii) of the Maryland Code, a person who is acting under the supervision of an investigative or law enforcement officer may record another person without the person being recorded having knowledge.  The Supreme Court of Maryland held in *Seal v. State*, 447 Md. 64 (2016), that a "complete absence of supervision" did not satisfy the statute but emphasized that the appropriate level of supervision is a fact specific inquiry, based upon the unique context of an investigation. Here, a third party recorded the appellant's oral communications without the appellant's knowledge.  An FBI agent and Maryland State Trooper provided the third party with a

digital recorder and instructions on how and when to operate the recorder.  At least one of the law enforcement officers was in daily contact with the third party, and they maintained contact for the purpose of receiving updates about the appellant's involvement in a crime.  Because the appellant lived with the third party, maintaining contact with the law enforcement officers introduced the issue of the third party's safety.  The circuit court correctly admitted the two recordings made by the third party because, considering the need to protect the third party's safety, the law enforcement officers maintained sufficient contact with the third party to deem her to be under their supervision.

Circuit Court for Dorchester County
Case No.: C-09-CR-19-000259

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1477

September Term, 2021

_____

JOHN MICHAEL INGERSOLL, JR.

v.

STATE OF MARYLAND

_____

Friedman,
Zic,
Sharer, J. Frederick,
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Zic, J.
Concurring Opinion by Friedman, J.

_____

Filed: May 31, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

A jury in the Circuit Court for Dorchester County convicted John Ingersoll, Jr., appellant, of first-degree murder, use of a handgun in the commission of a crime of violence, and illegal possession of a firearm. The court sentenced Mr. Ingersoll to serve life without the possibility of parole, plus 20 years.

On appeal, Mr. Ingersoll presents two questions, which we rephrase slightly:

1. Did the trial court err or abuse its discretion by admitting expert testimony on gangs?

2. Did the trial court err in denying Mr. Ingersoll's pretrial motion to suppress audio recordings under the Maryland Wiretap Act?

For the following reasons, we hold that the trial court did not err by admitting the expert testimony and that the audio recordings were permitted under the Maryland Wiretap Act. We thus affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after midnight on June 4, 2001, Gregory Collins, age 32, was shot and killed while driving home from his job as a correctional officer at the Eastern Correctional Institution ("ECI"). Mr. Ingersoll was a person-of-interest in the initial investigation into the murder, along with others, but the case went cold.

Eighteen years later, the Maryland State Police ("MSP") coordinated with a woman living with Mr. Ingersoll[1] to surreptitiously record him inculpating himself in the murder. On September 13, 2019, Mr. Ingersoll was indicted in the circuit court. Following a hearing, the court denied a pretrial motion to suppress the recordings of Mr.

---

[1] We will refer to this woman throughout this opinion as Ms. Doe.

Ingersoll under the Maryland Wiretap Act. The court also held a pretrial *Daubert-Rochkind*[2] hearing and, on the first day of trial, denied Mr. Ingersoll's motion *in limine* to exclude expert testimony about gangs, generally, and Dead Man Incorporated ("DMI"), the gang to which Mr. Ingersoll was alleged to belong, specifically.

The case against Mr. Ingersoll was tried to a jury over four days in June 2021. The State called twenty witnesses. Mr. Ingersoll elected not to testify in his case and called one witness. Because the challenges raised on appeal pertain to the court's pretrial rulings, we briefly summarize the evidence to provide context.

On June 2, 2001, Mr. Collins worked at ECI from 4 p.m. until 8 p.m., and then stayed for an overtime shift from 8 p.m. until midnight. He lived in Vienna, Maryland, which is about an hour away from ECI. He did not return home that night and his wife reported him missing the next day. A state trooper discovered Mr. Collins' pickup truck in the woods along Indiantown Road in Vienna, where it had veered off the road and crashed. Mr. Collins was found dead in the driver's seat. The back window of the cab of his truck was shattered and Mr. Collins had died from a single gunshot wound to the back of his head.

The State's theory of the case was that Mr. Ingersoll carried out a targeted hit on Mr. Collins, as directed by DMI. It further theorized that Mr. Ingersoll mistakenly shot at another man's truck the weekend before Mr. Collins' murder.

---

[2] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Rochkind v. Stevenson*, 471 Md. 1 (2020).

Mr. Ingersoll knew Mr. Collins from when he had been incarcerated at ECI from August 1999 through October 2000, housed in the compound where Mr. Collins had worked. There was evidence that Mr. Ingersoll had been a member of DMI, a security threat group or prison gang, since about 1999. At some point prior to 2010, Mr. Ingersoll attained the rank of "commander" within DMI.

The State adduced evidence about another shooting that had occurred in nearly the same location over Memorial Day weekend in 2001, a week before Mr. Collins was killed. Gary Camper, Sr. testified that in 2001, he was driving a pickup truck on Indiantown Road in Vienna near the "little bridge." He saw a truck on the side of the road and tried to go around it when someone shot at his truck, blowing out the passenger side window. Mr. Camper said that he reported the incident to the police.

Trooper John Bollinger, who investigated Mr. Collins' murder in 2001, testified that he interviewed Mr. Camper two days after the murder because he received information that his pickup truck had been "shot at about a week prior to [Mr. Collins'] homicide." Contrary to Mr. Camper's testimony, there was no record that Mr. Camper ever reported the incident to the police.

Mr. Camper previously had been married to Ms. Doe, and they shared custody of their son. In May 2019, Mr. Ingersoll began renting a room from Ms. Doe, who lived in a three-bedroom house in East New Market, Maryland. In late May 2019, Mr. Ingersoll told Ms. Doe that he had once shot at Mr. Camper and apologized to Ms. Doe for it because he had not realized that she and Mr. Camper had a son together. Ms. Doe had

3

reason to believe that the shooting of Mr. Camper's truck was connected to the shooting of Mr. Collins.[3]

In June 2019, Ms. Doe told Special Agent Ryan McCabe, a member of an FBI narcotics taskforce assigned to the Eastern Shore of Maryland, that the tenant living with her might have information about Mr. Collins' murder. Ms. Doe had been working with Special Agent McCabe since February 2019 on an unrelated case. Because the crime was not within the FBI's jurisdiction, Agent McCabe contacted Corporal Scott Sears with the MSP Homicide Division in Salisbury and arranged a meeting with him, Cpl. Sears, and Ms. Doe. As a result of that meeting, Ms. Doe was given a digital recorder and agreed to record conversations between herself and Mr. Ingersoll.

On August 25 and August 30, 2019, Ms. Doe recorded Mr. Ingersoll making inculpatory statements about Mr. Collins' murder. Excerpts of the recordings were played for the jury over defense objection. In the recordings, Mr. Ingersoll claimed that he met Mr. Collins at ECI and that Mr. Collins had made a disparaging comment about Mr. Ingersoll's mother, stating, "I know your mother. She's a [f*cking] whore."[4] According to Mr. Ingersoll, Mr. Collins said this "in front of everybody" at ECI. Mr.

---

[3] A discussion between counsel and the trial judge established that this was because ballistics analysis initially had linked the shooting of Mr. Camper's truck to Mr. Collins' murder, and this had been publicized in the media. The ballistics analyst was Joseph Kopera, who later was discovered to have lied about his qualifications, calling his opinions into question in this and other cases. Consequently, the State resubmitted the ballistics evidence for comparison in 2019.

[4] The State theorized that Mr. Ingersoll meant his grandmother, who had raised him and he referred to as his mother.

Ingersoll responded, "Bitch, you're good as [f*cking] dead." He made that threat in front of other DMI members, including an inmate named Perry Roark. Mr. Roark told Mr. Ingersoll that he "better follow through with that." Mr. Ingersoll explained to Ms. Doe that he had no choice but to carry it out. He knew that if he didn't, "they was going to kill [Mr. Collins]" anyway.

After Mr. Ingersoll was released from prison, another member of DMI came to his house in Preston, Maryland, and gave him Mr. Collins' address and his work schedule.[5] Mr. Ingersoll recalled in his conversations with Ms. Doe that it was around a holiday weekend, either Labor Day or Memorial Day. Mr. Ingersoll admitted to first shooting Mr. Camper's truck by mistake but denied that the same gun was used in that shooting and the later shooting of Mr. Collins. Mr. Ingersoll later returned to "the bridge" on Indiantown Road and waited for Mr. Collins for "three, four hours." The other member of DMI was with him. Mr. Ingersoll told Ms. Doe that he blocked Mr. Collins' truck when he stopped at a stop sign, got out of his vehicle, confronted Mr. Collins, who also got out of his vehicle, and shot him in the chest.[6]

---

[5] This was consistent with evidence that, in April 2001, an ECI correctional officer roster, including the names of officers and their shifts, was found in the possession of an inmate. An investigation into the leak resulted in the termination of two employees in the personnel office and the finance office at ECI. The same employees would have had access to the home addresses for correctional officers.

[6] As explained above, Mr. Collins was shot in the back of the head. There was no evidence that he exited his truck prior to being killed. The State argued that this discrepancy was borne of Mr. Ingersoll's desire to inflate the circumstances of the murder to impress Ms. Doe.

5

Lieutenant David Barnhart, who worked in the investigative division of the intelligence unit in the Department of Public Safety and Correctional Services ("DPSCS"), testified, over objection, as an expert in prison gangs and gangs generally. We will discuss his testimony in more detail below.

The State also presented testimony from two men who were incarcerated with Mr. Ingersoll at the Dorchester County Detention Center while he was awaiting trial in this case, both of whom testified that Mr. Ingersoll confessed to them. Willie Lewis testified that Mr. Ingersoll told him that Mr. Ingersoll shot Mr. Collins in the head because Mr. Collins had been "nasty to him" when Mr. Ingersoll was at ECI. Mr. Lewis further testified that Mr. Ingersoll said that he shot a neighbor's truck by mistake six days before the murder. Mr. Ingersoll told Mr. Lewis that he had spoken to that neighbor and asked the neighbor not to press charges.

Thirteen cartridge casings recovered at the crime scene were analyzed. A firearms and toolmarks examiner opined that one grouping of nine casings were consistent with having been fired from the same 9 mm weapon and a second grouping of four casings were consistent with having been fired with the same 9 mm weapon, but that the two groups could not have been fired from the same weapon. This was consistent with Mr. Ingersoll's statements in the recordings that he used a different gun to shoot Mr. Collins than he had when he mistakenly shot at Mr. Camper.

We will include additional facts in our discussion of the issues.

6

**I.** **THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING EXPERT TESTIMONY REGARDING GANGS.**

Mr. Ingersoll contends that the trial court abused its discretion by denying his motion *in limine* to exclude Lt. Barnhart from testifying as an expert in gangs and DMI in particular. Before turning to his specific arguments, we provide the following background.

**A.** **The *Daubert-Rochkind* Hearing**

On September 30, 2020, the State gave notice of its intent to offer Lt. Barnhart as an expert in "gang activity, specifically [DMI] as it relates to the history and founders of DMI, violent customs of DMI, initiation practices and the culture of retaliation of DMI, hierarchy and rank, common practices and acts of violence of this gang." Mr. Ingersoll moved to exclude Lt. Barnhart's testimony, arguing that it was "irrelevant, unreliable[,] and inadmissible under the newly adopted *Daubert* standard and Maryland Rule [5-]702." Mr. Ingersoll requested a *Daubert* hearing. He also moved to exclude the testimony under Md. Rule 5-404(b) as improper other crimes evidence.

On May 26, 2021, the court held an evidentiary hearing. Lt. Barnhart testified that he was a "correctional officer lieutenant" for DPSCS and was assigned to the Criminal Investigations Division of the Intelligence Unit. He began his career in 1998 as a correctional officer at the Roxbury Correctional Institution in Hagerstown before moving to North Branch Correctional Institution in Cumberland, where he remained. About a decade later, in 2007, he began working in the Intelligence Unit.

Lt. Barnhart had received "multiple levels of training" in prison gangs over a period of 15 years. He had taken courses offered by the Maryland Police and Correctional Training Commission; St. Petersburg College; the American Military University; and the Mid-Atlantic Regional Gang Investigators Network ("MARGIN"). The trainings included information specific to each prominent gang, including DMI, and provided information about the "structure, the rank, the rules" and any use of slang among the gang members. Lt. Barnhart estimated that the trainings amounted to 30-40 hours per year, for a total of more than 400 hours of training over 15 years. He was certified by MARGIN as a gang specialist. He had been qualified as an expert witness on one prior occasion and had testified about the Aryan Brotherhood.

Lt. Barnhart also learned from his on-the-job experience with prison gangs. The Intelligence Unit tracked gang members to prevent violence and drug trafficking within the prisons. As part of that undertaking, Lt. Barnhart interviewed and engaged with gang members on a daily basis.

Through his training and experience, Lt. Barnhart learned that the most prominent gangs in Maryland were the Black Guerilla Family ("BGF"), the Bloods, the Crips, and DMI. DMI was founded at the Maryland Correction Institution around 2000. Lt. Barnhart had interviewed the three founders, including Mr. Roark, all of whom had been incarcerated at North Branch at some point. DMI was modeled after BGF and was formed with the blessing of the leaders of BGF. DMI now operated inside and outside of prisons and had spread throughout the country. Communication between members

8

incarcerated at different prisons and between inmates and members on the street was routine.

Lt. Barnhart explained that DMI's hierarchy was based on a pyramid, with a supreme commander at the top, followed by the council of governors, who are three elder members of the gang, followed by lieutenant commanders, field generals, and foot soldiers. Foot soldiers were known as "dawgs."

Lt. Barnhart reviewed questionnaires completed by Mr. Ingersoll when he was processed at the Maryland Reception and Diagnostic Correctional Center in 2010. Mr. Ingersoll self-identified as a member of DMI during intake. Lt. Barnhart also reviewed photographs of Mr. Ingersoll's tattoos, which were consistent with his membership in DMI. Specifically, Lt. Barnhart noted that pyramids and the numbers four, thirteen, and nine, which represent the placement of the letters D, M, and I in the alphabet, are symbols used by DMI members. In his experience, almost every member of DMI has a tattoo of a pyramid and those numbers somewhere on their body. Mr. Ingersoll also had a tattoo of a pit bull, which likely symbolized a "dawg."

Lt. Barnhart opined that DPSCS will "validate" an inmate as a gang member if they score ten or higher on a point system. A document in Mr. Ingersoll's commitment record showed that he had been validated as a member of DMI with a score of 14 on that scale based upon his self-admission of membership and his tattoos. Lt. Barnhart stated that self-admission of membership is "worth" 8 points but is not sufficient standing alone to "validate." The same document reflected that Mr. Ingersoll's rank was a "commander," which "put him with that upper DMI structure." Lt. Barnhart opined that

Mr. Ingersoll could have achieved that rank based upon his length of time in the gang, trust established with the council of elders, and the "work" he "put in for the gang," such as "acts of violence" or drug trafficking.

In Lt. Barnhart's experience, if a DMI member were ordered to do something by a higher ranked member, he would be obligated to carry out that order or face severe consequences, ranging from expulsion from the gang to being physically assaulted or killed. Lt. Barnhart explained that he had "seen many times" when an inmate was ordered to do something by a "high ranking person within the gang," does not comply, and the member is "dealt with either through violence or however they choose to do so." A gang member within the prison system who was unwilling to carry out an order would either "face [a] sanction from the gang" or, if they sought help from DPSCS staff, might be placed in protective custody.

On cross-examination, Lt. Barnhart acknowledged that North Branch has a lower population of DMI members, with only 50 validated members out of 1,200 inmates. He had performed around 20 investigations that involved DMI during his career. His knowledge of DMI's history was based upon "learned information," television shows, and "hands on expertise" within the Maryland prison system, where DMI started, including review of documents seized from inmates.

In response to questions from the court, Lt. Barnhart testified that DPSCS maintains a searchable database of tattoos to assist in determining if inmates have gang affiliations. The court noted that it was concerned with whether Lt. Barnhart had a

"methodology for coming up with these conclusions[.]" Lt. Barnhart offered to provide the court a copy of the score sheet used to validate gang members.

The day after the hearing, Lt. Barnhart provided three supplemental exhibits to the court, which also were shared with counsel.[7] First, he provided a DPSCS Security Threat Group Validation Worksheet listing fourteen criteria and associated point values for use in validating an inmate as a member of a gang. Consistent with Lt. Barnhart's testimony, self-admission was worth eight points. The presence of gang related tattoos was worth six points. As mentioned, Mr. Ingersoll's validation score was 14 points. Second, he provided two redacted screen shots of DPSCS's "Automated Gang Intel" database reflecting searches for tattoos with "4-13-9", which returned results showing inmates validated as members of DMI, and for "276", which returned results showing inmates validated as belonging to a different prison gang.

## B. The Circuit Court Ruling

On the first day of trial, the court ruled on the motion *in limine*. The court first determined that Lt. Barnhart was "qualified as an expert in the field of gangs found within the Maryland prison system and their operations, both inside and outside prison walls, by reason of his knowledge, skill, experience, training and education." The court found that he had gone through 300-400 hours of formal training and "uncountable hours of on-the-job training which he correctly identified as being his most important training."

---

[7] The supplemental exhibits were supplied to this Court in an unopposed motion to correct the record, which we granted. Though four attachments were included with that motion, two of them were identical.

11

He had "demonstrate[d] specific knowledge about [DMI] history, gang structure, [DMI] gang philosophy and [DMI] gang symbols and tattoos." He also testified about "personal experience with the founding members of DMI including Perry R[o]ark who was . . . one of the founding fathers of DMI." The court found that the Division of Corrections maintained "a database of gang membership to assist, among other things, in housing decisions to avoid gang warfare and the investigation of crimes committed by gangs in prison[,]" and that it included "information harvested in a standard manner on standard forms throughout the Division of Corrections."

Applying the factors identified by the Supreme Court of Maryland in *Rochkind v. Stevenson*, 471 Md. 1 (2020), the court found that Lt. Barnhart was "proposing to testify about matters that naturally and directly come from a data collection and research into Division of Corrections gang intelligence that has been collected and conducted over the years." The data was collected in the normal course of DPSCS practice and not in anticipation of the litigation. Likewise, Lt. Barnhart's opinions were "not developed expressly for the purpose of testifying in this case" but rather were "cultivated through historical experience and data collection. The short word for that is intelligence."

For all those reasons, the court found:

> after focusing on the reliability of the methodology used to collect data and intelligence on gang membership and activity and the application or use of that data, Lieutenant Barnhart is qualified pursuant to Maryland Rule 5-702 and the *Daubert/Rochkind* analysis to testify as an expert on [DMI], as more particularly set forth before.

12

Turning to Rule 5-403, the court considered whether the opinions Lt. Barnhart would offer pertaining to DMI were "more probative than prejudicial." By reference to the Supreme Court's decision in *Burris v. State*, 435 Md. 370 (2013), the court emphasized that the State bore the burden to adduce "fact evidence" demonstrating "a nexus between the crime and the gang membership" and, if satisfied, to establish that "the evidence being presented about gang involvement [was] necessary to prove the crime." It would not "permit incendiary evidence of the bad acts of DMI in general" because they were "wholly unrelated to the facts which are part and needed by the State to prove the case." The court noted that there was "a general objection by the defense regarding this testimony, both on the basis of the *Daubert* analysis, but also as probative versus prejudicial" and that the court would "consider that objection . . . preserved for future purposes if necessary."

### C. Trial Testimony

Lt. Barnhart was designated as an expert in prison gangs and gangs in general at trial. He identified Mr. Ingersoll's DPSCS intelligence file, which was admitted in evidence. He testified about those records, which reflected that in 2010, Mr. Ingersoll admitted to being a member of DMI for approximately eight years, beginning when he was incarcerated at Brockbridge Correctional Facility. Other DPSCS records reflected that Mr. Ingersoll was incarcerated at Brockbridge in 1998 and 1999. The intelligence file reflected that Mr. Ingersoll had achieved the rank of "commander" within DMI. Lt. Barnhart testified that Mr. Ingersoll's tattoos were consistent with his membership in DMI.

13

Lt. Barnhart explained that DMI began as a prison gang in the mid to late 1990s[8] but "spread to the streets." The gang was founded by Mr. Roark at the Maryland House of Correction. DMI was "antigovernment" and "didn't believe in law enforcement kind of like in a sovereign sort of way[.]" Lt. Barnhart explained the gang's hierarchy and explained that commanders were high ranking members, at the tier just below the council of elders.

He opined that for a member to move up in rank within DMI, he had to "put[] in work," which could include "carrying out an assault against a rival gang member, an assault against a correctional officer, being able to get money into the gang by getting drugs in the institution and selling them, or even just a little store from the commissary on your own to make money." If a DMI member made a threat and failed to carry it out, that would be a sign of weakness. If a member was given a direct order by a higher ranked member within DMI and failed to carry it out, the penalty could be death.

### D. Contentions on Appeal

Mr. Ingersoll contends that the court abused its discretion in admitting Lt. Barnhart's testimony for five reasons. First, he maintains that Lt. Barnhart's testimony was "not sufficiently reliable" because he only had testified as an expert once before about a different gang, his experience was not directly tied to DMI, and his training related to gangs in general, not DMI. Next, Lt. Barnhart's testimony had "limited probative value" because it was being introduced to "corroborate [Mr. Ingersoll]'s self-

---

[8] This is earlier than the year Lt. Barnhart testified to at the *Daubert-Rochkind* hearing.

14

incriminating statements" that he was a DMI member and carried out the murder on direct orders from higher ranking members. Third, because the DPSCS gang unit was not established until 2006, Lt. Barnhart's knowledge was limited to gang activity well after the murder. Additionally, Lt. Barnhart's testimony did not establish Mr. Ingersoll's membership in DMI in 2001, only that he joined DMI at some point prior to 2010. Fifth and finally, the testimony was unfairly prejudicial and created a risk that the jury would infer Mr. Ingersoll's guilt based on his membership in DMI.

The State responds that, consistent with federal cases applying the *Daubert* standard to expert testimony about gangs, the circuit court here properly determined that Lt. Barnhart's testimony was sufficiently reliable to be admissible. The testimony was relevant to assist the jury to place the statements made by Mr. Ingersoll during his recorded statements to Ms. Doe in context. Further, the probative value of the testimony was not outweighed by the danger of unfair prejudice because it was highly probative on the issue of motive.

### E.    Analysis

"We review a circuit court's decision to admit expert testimony for an abuse of discretion." *Abruquah v. State*, 483 Md. 637, 652 (2023). Because of the deference afforded to a trial court in this area, it is the "rare case in which a Maryland trial court's exercise of discretion to admit or deny expert testimony will be overturned." *State v. Matthews*, 479 Md. 278, 306 (2022). "[A]n appellate court does 'not reverse simply because the . . . court would not have made the same ruling[,]'" but only if "'the trial court's decision . . . [is] well removed from any center mark imagined by the reviewing

15

court and beyond the fringe of what that court deems minimally acceptable.'" *Id.* at 305

(quoting *Devincentz v. State*, 460 Md. 518, 550 (2018) (internal quotation marks and

citation omitted)).

### 1. *Admissibility under Rule 5-702*

As this Court recently explained:

> Expert testimony is governed by the *Daubert-Rochkind* standard and Maryland Rule 5-702. Rule 5-702 lays out three requirements to admit an expert: (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony. In [*Rochkind*, 471 Md. at 1], the Supreme Court of Maryland held that all Maryland courts were to interpret Rule 5-702 according to the [*Daubert*, 509 U.S. 579] analysis in lieu of the previous[ly] prevailing *Frye-Reed* test. The *Rochkind* court held that *Daubert* required a flexible inquiry into an expert's reliability, focusing on the expert's principles and methodology as opposed to their conclusions. *Rochkind*, 471 Md. at 36. However, "a trial court must also consider the relationship between the methodology applied and conclusion reached." *Id*. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. (quoting *General Elec. Co., v. Joiner*, 522 U.S. 136, 146 (1997)). Finally, the Supreme Court of Maryland held that in accord with the Federal approach, the *Daubert* analysis should be applied to the admission of all expert testimony. *Rochkind*, 471 Md. at 36.

*Covel v. State*, 258 Md. App. 308, 329 (2023).

The Supreme Court in *Rochkind* identified ten factors that a court *may* consider in

interpreting Rule 5-702 to determine if the proposed testimony is sufficiently reliable,

drawn from *Daubert* and an Advisory Committee Note to Federal Rule of Evidence 702:

16

(1) whether a theory or technique can be (and has been) tested;
(2) whether a theory or technique has been subjected to peer review and publication;
(3) whether a particular scientific technique has a known or potential rate of error;
(4) the existence and maintenance of standards and controls;
(5) whether a theory or technique is generally accepted;
(6) whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;
(7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
(8) whether the expert has adequately accounted for obvious alternative explanations;
(9) whether the expert is being as careful as he or she would be in his or her regular professional work outside his or her paid litigation consulting; and
(10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Rochkind*, 471 Md. at 35-36 (cleaned up). The factors are non-exclusive. *Id*. at 35. The test is "flexible" and "'*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a [trial] court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" *Id*. at 36 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999)).

In the instant case, we hold that the trial court did not abuse its discretion in the exercise of its gatekeeping role when it determined that Lt. Barnhart's expert testimony was sufficiently reliable to be admitted under Rule 5-702. *See id.* at 33 ("Under *Daubert*, judges are charged with gauging only the threshold reliability – not the ultimate validity –

17

of a particular methodology or theory."). Federal decisions draw a distinction between expert testimony that is "primarily experiential in nature as opposed to scientific." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). Scientific testimony is "characterized by 'its falsifiability, or refutability, or testability.'" *Id.* (quoting *Daubert*, 509 U.S. at 593). "Experiential expert testimony, on the other hand, does not 'rely on anything like a scientific method.'" *Id.* (quoting Fed. R. Evid. 702 advisory note). This does not diminish its reliability, however. *Id.*

In this case, Lt. Barnhart's extensive experience and training in prison gangs over many years, coupled with his knowledge of the history, hierarchy, and practices of DMI served as a reliable basis for him to testify as an expert on those subjects. *See United States v. Holguin*, 51 F.4th 841, 856 (9th Cir. 2022) (holding under *Daubert* and FRE 702 that "[e]xperience alone is a reliable basis for the expert testimony regarding gang structure and activities"). His opinions elucidating the hierarchy of DMI, how members rise through that hierarchy, the way inmates are validated as gang members within the Division of Corrections, and the consequences faced by DMI members if they fail to carry out orders, were drawn from that training and experience and are not unlike testimony held admissible in federal cases applying *Daubert*. *See id.* (holding that a district court did not err by admitting testimony from a law enforcement officer "about the structure and activities of criminal organizations based solely on experience"); *United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014) (holding that gang-expert testimony was admissible to provide "expertise about [the gang's] structure, insignia and history," "[a]nd the district court could have assumed that a typical juror would lack

knowledge of the gang terminology and the significance of [the] insignia"); *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019) (holding that the district court correctly admitted an FBI agent's testimony on the interpretation of gang and drug terminology and reasoned that the application of his lengthy experience in drug and gang investigations was a reliable methodology).

Mr. Ingersoll's arguments that Lt. Barnhart's experience with DMI post-dated the murder by five years and that much of his training was not specific to DMI go to the weight to be accorded to his testimony, not to its admissibility. Further, though he could not testify with precision as to the date that Mr. Ingersoll joined DMI, there was ample evidence from which the jury could infer that Mr. Ingersoll joined DMI prior to Mr. Collins' murder, most notably Mr. Ingersoll's statement on the DPSCS questionnaires in which he admitted joining DMI while incarcerated at the Brockbridge Correctional Facility, which other records revealed to have been from June 1998 through June 1999.

Lt. Barnhart's testimony applied his extensive knowledge about gangs, generally, and DMI, in particular, garnered from training and experience, to reach conclusions about the gang's structure, hierarchy, and internal rules. This was a reliable methodology that satisfied the *Daubert-Rochkind* standard.

### 2. *Admissibility under Rule 5-403 and 5-404(b)*

Though admissible under Rule 5-702, expert testimony still must be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice" under Rule 5-403 or if it is inadmissible propensity evidence under Rule 5-404(b). Evidence is unfairly prejudicial when "'it might influence the jury to disregard the evidence or lack of

19

evidence regarding the particular crime with which [the defendant] is being charged.'" *Odum v. State*, 412 Md. 593, 615 (2010) (quoting Lynn McLain, *Maryland Evidence: State and Federal*, § 403:1(b) (2d ed. 2001)). Similarly, "[t]he primary concern underlying . . . Rule [5-404(b)] is a 'fear that jurors will conclude from evidence of other bad acts that the defendant is a "bad person" and should therefore be convicted, or deserves punishment for other bad conduct and so may be convicted even though the evidence is lacking.'" *Hurst v. State*, 400 Md. 397, 407 (2007) (quoting *Harris v. State*, 324 Md. 490, 496 (1991)).

In *Gutierrez v. State*, 423 Md. 476, 481-82 (2011), the Supreme Court of Maryland held that "expert testimony about the history, hierarchy, and common practices of a street gang is admissible as proof of motive" if "fact evidence establishes that the crime charged was gang-related and the probative value of the testimony is not substantially outweighed by any unfair prejudice to the defendant." The expert testimony introduced in *Gutierrez* pertained to the defendant's affiliation with MS-13, a street gang. *Id.* The Court recognized the "highly incendiary nature of gang evidence" and the risk that jurors will "determine guilt by association," but reasoned that the probative value of the evidence could substantially outweigh the danger of unfair prejudice when there is "*fact* evidence showing that the crime was gang-related." *Id.* at 495-96 (emphasis in original).

The Court held that the expert's testimony 1) explaining the Spanish name for MS-13 and why a phrase uttered by the perpetrator denoted ties to the gang, 2) explaining the process of "jumping in" a new member, and 3) explaining that MS-13 gang members

20

"respond to insults with punishment 'up to death,'" and that they respond to "'false flagging'" with violence, was relevant, probative, and not unfairly prejudicial. *Id*. at 498-99. The Court reasoned, however, that the court should have excluded the expert's opinion that MS-13 was the most violent gang in the region. *Id.* at 499. Nevertheless, that error was harmless beyond a reasonable doubt and did not warrant reversal. *Id*. at 499-500.

Two years later, in *Burris*, the Supreme Court reversed a defendant's conviction for first-degree murder and use of a handgun, holding that the trial court improperly admitted highly prejudicial expert testimony about his affiliation with the BGF, which the State used to support its theory that the defendant was a BGF hit man and was ordered by his gang boss to kill the victim to satisfy a debt to the gang boss. 435 Md. at 374, 384. Though it concluded that the State satisfied the threshold nexus for admissibility identified in *Gutierrez* by adducing fact evidence that the crime was gang related, the Court nevertheless concluded that the probative value of the expert's testimony was outweighed by its potential for unfair prejudice. *Id*. at 391-92. Specifically, the Court pointed to the expert's testimony about BGF's propensity for violence and its control over Maryland prisons and jails and his "graphic" testimony about the defendant's tattoos,[9] which implied that he had a propensity to kill and that he had previously been incarcerated. *Id*. at 394-396. This evidence all was highly prejudicial, in the Court's

_____

[9] For example, the expert testified that the defendant had a "187 and a picture of a weapon" on his arm, which signified a section of the California penal code addressing homicide. *Id.* at 395.

21

view.  The probative value of the expert testimony, on the other hand, was quite limited given that the State had adduced ample fact evidence showing that the defendant was a member of BGF and the expert's testimony did not establish that the defendant had a motive to kill or that some of the witnesses against him had recanted their statements because of the gang affiliation.  *Id*. at 396-97.

We return to our case.  The State clearly satisfied its threshold showing of a nexus between the crime and Mr. Ingersoll's gang membership.  In his recorded conversation with Ms. Doe, Mr. Ingersoll stated that he threatened to kill Mr. Collins in front of Mr. Roark and, upon doing so, he knew he had no choice but to carry out that threat.  He further stated that an unnamed DMI member came to his house after his release, provided him with Mr. Collins' home address and work schedule, and accompanied him when he went to kill Mr. Collins.  Thus, expert testimony about DMI was admissible unless its probative value on the issue of motive was substantially outweighed by the danger of unfair prejudice.

We conclude that the evidence here was highly probative of motive and did not cross the line into unfair prejudicial incendiary gang testimony of the type discussed in *Burris*.  Lt. Barnhart's testimony corroborated Mr. Ingersoll's statements to Ms. Doe about his affiliation with DMI and explained his fear of repercussions if he did not follow through with the threat he made against Mr. Collins.  It also established the central role of Mr. Roark in the founding and leadership of DMI, which underscored the seriousness of Mr. Ingersoll's statement to Ms. Doe that the order to kill Mr. Collins came directly from Mr. Roark.  Unlike in *Burris*, Lt. Barnhart did not detail violent acts committed by DMI

22

or link Mr. Ingersoll's tattoos to prior acts of violence. Rather, his testimony focused upon the permissible subjects identified in *Gutierrez*: the structure, hierarchy, and rules of the gang. The court did not err by admitting the testimony.

## II. THE RECORDINGS OF MR. INGERSOLL'S CONVERSATIONS WITH MS. DOE SATISFIED THE MARYLAND WIRETAP ACT AND WERE ADMISSIBLE AT TRIAL.

Mr. Ingersoll contends that the circuit court erred by denying his motion to suppress the August 25, 2019 and August 30, 2019 recordings of statements he made to Ms. Doe because both were obtained in violation of the Maryland Wiretap Act, Md. Code, Cts. & Jud. Proc. §§ 10-401 to 10-414. As pertinent here, that statute makes it unlawful to "[w]illfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" except as specifically allowed. Cts. & Jud. Proc. § 10-402(a). An oral communication includes "any conversation or words spoken to or by any person in private conversation." Cts. & Jud. Proc. § 10-401(13)(i). An unlawfully intercepted communication is inadmissible in any court proceedings. Cts. & Jud. Proc. § 10-405. The statute excepts from these prohibitions the interception of "wire, oral, or electronic communication[s] in order to provide evidence" of the commission of certain crimes, including murder, if the interception is undertaken by "an investigative or law enforcement officer acting in a criminal investigation *or any other person acting at the prior direction and under the supervision of an investigative or law enforcement officer*[.]" Cts. & Jud. Proc. § 10-402(c)(2)(ii). At issue in this case is whether Ms. Doe was "acting . . . under the

23

supervision of an investigative or law enforcement officer" when she intercepted Mr. Ingersoll's oral communications inculpating himself in the murder of Mr. Collins.

## A.  Standard of Review

"Our review of a circuit court's denial of a motion to suppress evidence is 'limited to the record developed at the suppression hearing.'" *Pacheco v. State*, 465 Md. 311, 319 (2019) (quoting *Moats v. State*, 455 Md. 682, 694 (2017)).  "[W]e view the evidence presented at the [suppression] hearing, along with any reasonable inferences drawable therefrom, in a light most favorable to the prevailing party." *Davis v. State*, 426 Md. 211, 219 (2012).  "We accept the suppression court's first-level findings unless they are shown to be clearly erroneous." *Brown v. State*, 452 Md. 196, 208 (2017).  "We give no deference, however, to the question of whether, based on the facts, the trial court's decision was in accordance with the law." *Seal v. State*, 447 Md. 64, 70 (2016).

## B.  Suppression Hearing

The circuit court held a suppression hearing on September 29, 2020.  The State called Special Agent McCabe and Cpl. Sears to testify about their interactions and supervision of Ms. Doe during the relevant period.  Agent McCabe testified that he worked for a violent crime investigative unit for the FBI based in Annapolis and that his unit covered the Eastern Shore of Maryland.  Ms. Doe was working as a confidential human source for the FBI on an unrelated case beginning in January or February of 2019.  In June 2019, Ms. Doe divulged to Agent McCabe that she might have information about a homicide and that she thought her tenant might be responsible.

24

Because there was no "federal nexus" to the murder of Mr. Collins, Agent McCabe contacted the MSP Homicide Division in Salisbury and arranged a meeting with him, Ms. Doe, and Cpl. Sears. Nevertheless, Agent McCabe facilitated communications between Ms. Doe and the MSP because he had an "ongoing relationship with [her]."

As a result of the meeting, Cpl. Sears provided Ms. Doe with a digital recorder on June 25, 2019. It was about 4 inches long, 1 inch wide, and 1 inch deep. Agent McCabe and Cpl. Sears demonstrated to Ms. Doe how to operate the device. It was activated by sliding an "on button" that put it in a "state that's ready to record." The recording could then be activated by pushing the record button. Ms. Doe was instructed that she needed to keep the recorder on her person, that it "couldn't be unattended," and that it needed to be "actively under her control while she was using it." Ms. Doe was told to record conversations "relating to the murder of Gregory Collins." She was instructed to stop recording when it was safe to do so.

Ms. Doe was not in contact with Agent McCabe or Cpl. Sears again until August 8, 2019, when they picked her up at her house. She returned the digital recorder, which contained 29 separate recordings. The State did not seek to introduce these recordings at trial.

From August 8, 2019 forward, Agent McCabe was in contact with Ms. Doe daily if not multiple times per day. As pertinent, on August 20, 2019, Ms. Doe called Agent McCabe to advise that Mr. Ingersoll was transported to the hospital by the police but had not been arrested. The next day, she called and said Mr. Ingersoll had either been arrested or emergency petitioned. On August 22, 2019, she reported that Mr. Ingersoll

25

was being released from the hospital and requested a new recording device. That same day, Agent McCabe and Cpl. Sears delivered a new recording device to Ms. Doe by leaving it in a plastic bag on the edge of her property.[10] The next day, Agent McCabe spoke to Ms. Doe to confirm she had retrieved the device and to instruct her to try to keep background noise low when she was recording.

On August 24, 2019, Ms. Doe called to report that her teeth had been knocked out trying to prevent Mr. Ingersoll from hurting himself. On August 26, 2019, Ms. Doe informed Agent McCabe that Mr. Ingersoll had confessed to criminal activity the prior night. Agent McCabe picked up Ms. Doe, brought her to the FBI office, retrieved the recorder from her, reviewed it, and provided her with a new device. The next day, Agent McCabe and Cpl. Sears picked her up again and spoke to her about where to position the recording device on her body to make the recording more audible.

Three days later, on August 30, 2019, Ms. Doe called Agent McCabe to report that she had obtained a new recording. She put the recording device in her mailbox and Agent McCabe picked it up later that same day. That was the final recording.

The State conceded that recordings made between June 25, 2019 and August 8, 2019, the period when Ms. Doe was out of contact with Agent McCabe and Cpl. Sears, were inadmissible because she was not acting under the supervision of law enforcement. The only recordings the State sought to rely upon at trial were the August 25, 2019 and August 30, 2019 recordings. The State emphasized Agent McCabe's daily contact with

---

[10] To protect Ms. Doe's safety, Agent McCabe and Cpl. Sears used surreptitious means to deliver new recorders to her.

Ms. Doe during the relevant period and the specific instructions she received on how to operate the recording device. It maintained that closer supervision was impossible here because of the risk to Ms. Doe if Mr. Ingersoll, who lived with her, was to discover that she was working with the police.

Defense counsel argued that the Supreme Court's decision in *Seal*, 447 Md. at 64, was dispositive and required suppression of all the recordings made by Ms. Doe. It maintained that there had to be "active supervision" by the police to satisfy the Wiretap Act, which, at a minimum, would have included placing limitations on when and for how long Ms. Doe could record Mr. Ingersoll. Instead, as in *Seal*, Ms. Doe was given a recording device "to use at her pleasure." The fact that Ms. Doe made dozens of recordings of Mr. Ingersoll, even though the State only sought to use two of them, was evidence that Ms. Doe was haphazardly recording Mr. Ingersoll in violation of his privacy rights. Defense counsel maintained that the decision in *Seal* made clear that supervision must include monitoring of the recording beyond instructing the third party on the use of the device and that Ms. Doe was given unlimited discretion on when and for how long to record Mr. Ingersoll.

The court took the matter under advisement and, on October 15, 2020, issued a memorandum opinion denying the motion to suppress the recordings that occurred after August 12, 2019. After making findings consistent with the above recitation of facts and setting out the law, the court determined that the relevant recordings fell within the "supervision exception" to the Wiretap Act. It reasoned that Ms. Doe was provided significant direction about using the recording device, including how to operate it, where

27

to place it on her body to ensure that the recordings were audible, not to leave it unattended, what subject matter to record, and to discontinue recording when it was safe to do so. Agent McCabe maintained frequent contact with Ms. Doe during the relevant period, speaking to her on the phone daily and meeting with her in person at least once per week. The substance of the meetings and phone calls pertained to the investigation into Mr. Ingersoll. Because the recordings were made with the prior direction and under the supervision of law enforcement during the investigation of a homicide, the court ruled that they were not made in violation of the Wiretap Act and denied the motion to suppress.

### C. Analysis

The Supreme Court of Maryland's decision in *Seal* is the lead case addressing the supervision exception under the Wiretap Act. That case concerned a 2013 investigation into allegations of sexual abuse that occurred in 1982, when the victim was ten years old. 447 Md. at 66-68. After the victim reported the abuse to the police in 2013, he and a police detective unsuccessfully attempted to call Seal several times so that the victim could attempt to elicit an admission from him. *Id*. at 68. The detective met with the victim soon after to make a second attempt at a monitored phone call but again was unsuccessful. *Id*. At the end of the second meeting, the detective gave the victim, who was a resident of West Virginia, the recording equipment to allow him to attempt to record a future telephone conversation with Seal. *Id*. The detective showed the victim how to use the equipment and the victim took it back to his home in West Virginia. *Id*. Approximately two weeks later, the victim recorded a phone call in which Seal made

28

several incriminating statements. *Id.* After that phone call, the detective met with the victim to retrieve the equipment. *Id.* at 68-69.

Seal was convicted of sex crimes and appealed, arguing in part that the court erred by denying his motion to suppress the recording under the Wiretap Act. *Id.* at 69. He maintained that the recorded call was not "supervised" because "all [the detective] did was give [the victim] the recording equipment with limited instructions about how to operate it." *Id.* at 72. After a split panel of this Court affirmed the judgment, the Supreme Court of Maryland granted *certiorari* and reversed. *Id.* at 70.

The Court emphasized that the procedures outlined in the Wiretap Act and its exceptions "must be strictly followed." *Id.* at 71 (citing *State v. Siegel*, 266 Md. 256 (1972)). It rejected the State's argument that cases interpreting the federal wiretap statute were strong persuasive authority on the construction of the supervision exception under the Wiretap Act because the Maryland act is more restrictive. *Id.* at 72-73. The federal law requires that a third party be acting under "color of law," which most of the federal cases cited by the State construed to mean acting under the "direction" of the government, not under its supervision. *Id* at 72-73, 77. Even so, several of the federal decisions involved more supervision than was present in *Seal*, including real-time monitoring of the intercepted communications, *United States v. Shields*, 675 F.2d 1152, 1154-55 (11th Cir. 1982), or "continuous, albeit irregular, contact" between the government and the third party. *Obron Atl. Corp. v. Barr*, 990 F.2d 861, 865 (6th Cir. 1993). In contrast, the trial court in *Seal* "treated the hand-over of the equipment as equivalent to supervision" even though the detective

29

set no limit, restriction[,] or requirement on the:

- Number or frequency of calls;
- Time of day or duration of calls;
- How or when to report back to police;
- Remote monitoring of calls by police;
- Inquiry about other criminal matters; or
- Maintaining a log of calls made.

*Id*. at 79-80.

The Court reasoned that the supervision requirement reflects the legislature's expectation that law enforcement will provide "instruction about limitations on use of the equipment," "when to report back to the officer," and will maintain regular contact with the third party. *Id*. at 80. The Court emphasized that it was not holding "that law enforcement must be present or listening remotely at the time of the recordings," or that "there can never be a two-week gap between communications when the police are supervising a person who is taping conversations." *Id*. at 81. Rather, it was a "fact-specific . . . inquiry." *Id*. The "*complete absence* of supervision" in *Seal* necessitated reversal of the denial of the motion to suppress. *Id*. (emphasis in original).

We return to the case at bar. Mr. Ingersoll contends that the facts here do not differ from those present in *Seal* in any meaningful way. We disagree.

The trial court found that law enforcement instructed Ms. Doe on the operation of the device, the requirement that she always maintain possession of the device, that she could not leave it unattended, the subject matter she should record, and that she should cease recording a conversation that began about that subject matter when safe to do so. During the relevant period, Agent McCabe was in daily contact with Ms. Doe by

telephone and in regular in-person contact as well.  The regular contact was for the purpose of receiving updates about Mr. Ingersoll's involvement in the Collins homicide and to determine if Ms. Doe had obtained a relevant recording or needed a new recording device.  For each of the two recordings that the State sought to introduce at trial, Ms. Doe provided the recording to the police the day after she made it.

Unlike in *Seal*, where the defendant was being recorded telephonically, Ms. Doe lived with Mr. Ingersoll, creating significant safety concerns.  Consequently, it would have been impossible for law enforcement to actively monitor the recordings or to require Ms. Doe to stop and start recording conversations if the topic deviated temporarily.  Within these confines, Cpl. Sears and Agent McCabe reasonably monitored and supervised the surveillance operation by maintaining close contact with Ms. Doe whenever she was away from Mr. Ingersoll.  As the Court emphasized in *Seal*, the level of supervision required in a given context is very fact specific.  On these facts, we hold that Ms. Doe was acting under the supervision of law enforcement when she made the recordings the State introduced at trial.

**JUDGMENTS OF THE CIRCUIT COURT FOR DORCHESTER COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

31

Circuit Court for Dorchester County
Case No.: C-09-CR-19-000259

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1477

September Term, 2021

_____

JOHN MICHAEL INGERSOLL, JR.

v.

STATE OF MARYLAND

_____

Friedman,
Zic,
Sharer, J. Frederick,
    (Senior Judge, Specially Assigned),

JJ.

_____

Concurring Opinion by Friedman, J.

_____

Filed: May 31, 2024

One aspect that the change from the old *Frye*/*Reed* standard to the new *Daubert*/*Rochkind* standard was supposed to improve was, in the area of forensic science, that courts would now exclude expert testimony that was generally accepted, but that was not reliable.[1] Regrettably, however, my colleagues in the majority are here accepting so-called police gang expert testimony—law enforcement and corrections officers who have learned about gangs on the job—that, although generally accepted,[2] has none of the

---

[1] This may be the long-term lesson of the Supreme Court of Maryland's recent decision in *Abruquah v. State*, 483 Md. 637 (2023). While it had long been generally accepted for experts to identify guns and bullets by toolmarks, the Supreme Court of Maryland held that the degree of certainty expressed by those experts overstated the reliability of the experts' testimony. *Id*. at 696-97. Thus, although the Court allowed the experts to testify, they were limited in the manner in which they could express their certainty: it was only reliable, the Court held, for these experts to testify that the toolmarks were "consistent" with having been fired from a particular gun. *Id*. at 694-95. In this way, the *Abruquah* decision (and maybe this concurrence) can be situated as part of a larger trend of carefully reconsidering the scientific basis for long-accepted forensic techniques under modern reliability standards. *See generally* COMM. ON IDENTIFYING THE NEEDS OF THE FORENSIC SCI. CMTY., NAT'L RSCH. COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 1-2 (2009) (available online at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf) (last visited Feb. 15, 2024); PRESIDENT'S COUNCIL OF ADVISORS ON SCI. & TECH., EXEC. OFF. OF THE PRESIDENT, FORENSIC SCIENCE IN CRIMINAL COURTS: ENSURING SCIENTIFIC VALIDITY OF FEATURE-COMPARISON METHODS 1 (2016) (available online at https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast fo rensic science report final.pdf.) (last visited Feb. 15, 2024); Maneka Sinha, *Radically Reimagining Forensic Evidence*, 73 ALA. L. REV. 879 (2022) (discussing expert testimony regarding various forensic techniques, including bitemark, fingerprint, firearms and toolmark, as unscientific, incomplete, inaccurate, or overstated science); Maneka Sinha, *Junk Science at Sentencing*, 89 GEO. WASH. L. REV. 52 (2021) (same); Jim Hilbert, *The Disappointing History of Science in the Courtroom: Frye, Daubert, and the Ongoing Crisis of "Junk Science" in Criminal Trials*, 71 OKLA. L. REV. 759 (2019); Paul C. Giannelli, *Forensic Science: Daubert's Failure*, 68 CASE W. RSRV. L. REV. 869 (2018).

[2] The leading case in Maryland, *Gutierrez v. State*, is illustrative of the general acceptance of this sort of police gang expert testimony. *Gutierrez v. State*, 423 Md. 476

(continued)

hallmarks of reliability that are now supposed to guide the admissibility of expert testimony.[3]

In my view, law enforcement and corrections officers should not be admitted as expert witnesses to testify about subjects that amount to the sociology of gangs. Rule 5-702 provides three limitations on potential expert witnesses in Maryland courts:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine
>
> (1)    whether the witness is qualified as an expert by knowledge, skill, experience, training, or education,

---

(2011). In *Gutierrez*, the State's expert was Sergeant George Norris, the supervisor of the Prince George's County Police Department's gang unit. The Supreme Court of Maryland (and Chief Judge Bell's dissent) analyzed whether Sgt. Norris' expert testimony was (1) relevant and (2) more probative than unfairly prejudicial. *Id*. But both majority and dissent seemed to assume that Sgt. Norris was qualified by his experience to render such opinions. Although his expertise may have been generally accepted at the time (and thus admissible under the *Reed*/*Frye* standard), his testimony was never, in my opinion, scientifically reliable (and thus inadmissible) once the *Daubert*/*Rochkind* standard became applicable a decade later.

[3] Of course, nothing in this concurrence should be interpreted as "pro-gang." Gangs and their members—at least those discussed herein—are a scourge that live outside of civilized society. Rather, my goal is to ensure that we provide gang members precisely the same protections of the judicial system that we all deserve. There cannot be a two-tiered system, in which we apply lower standards of admissibility to experts who testify against gang members than we do with experts in other types of litigation. Magdalena Ridley, *Down By Law: Police Officers as Gang Sociology Experts*, 52 CRIM. L. BULL. 1034, 1052-67 (2016) [hereinafter *Down by Law*] (comparing admissibility in gang prosecutions to all other types of litigation); Moreover, avoiding a two-tiered standard of expert witness admissibility is especially critical given the racialized nature of gangs and gang membership. *See generally* Sara Hildebrand, *Racialized Implications of Officer Gang Testimony*, 92 MISS. L.J. 155, 163-67 (2022) (describing racial and ethnic make-up of gangs).

(2)    the appropriateness of the expert testimony on the particular subject, and

(3)    whether a sufficient factual basis exists to support the expert testimony.

MD. R. 5-702. With these police gang experts there is a mismatch between subsections (1) and (2). That is, their "knowledge, skill, experience, training, [and] education" make them potentially capable of serving as experts, but not on the "particular subject" identified, which is the sociology of gangs.[4] Sociology is a social science, informed by the scientific method,[5] that rigorously studies the interaction and behaviors of human groups.[6] Sociology

---

[4] I am not suggesting, of course, that Lt. Barnhart couldn't be qualified today as an expert, for example, on DPSCS's anti-gang strategy, *see generally Ragland v. State*, 385 Md. 706 (2005) (permitting law enforcement officers to testify as experts based on skill, experience, training, or education), or, that he couldn't, should he go back to school, become an expert in gang sociology.

[5] The scientific method compels scientists to propose their theories and techniques in public, to the world, receive criticism, or contradictions, and then revise their theories and techniques. The result is a constant sharpening. *See, e.g., Scientific Method*, *Merriam-Webster Collegiate Dictionary* 1112 (11th ed. 2020) ("principles and procedures for the systematic pursuit of knowledge involving the recognition and formulation of a problem, the collection of data through observation and experiment, and the formulation and testing of hypotheses.").

[6] As one article explains:

Sociology is[:]

- [T]he study of society[;]

- [A] social science involving the study of the social lives of people, groups, and societies[;]

- [T]he study of behavior as social beings, covering everything from the analysis of short contacts between anonymous individuals on the street to the study of global social processes[;]

- [T]he scientific study of social aggregations, the entities through which humans move through their lives[; and]

(continued)

-3-

(and other related social science fields) have studied criminal gangs for over 100 years. Zachariah D. Fudge, *Gang Definitions, How do They Work?: What the Juggalos Teach Us About the Inadequacy of Current Anti-Gang Law*, 97 MARQ. L. REV. 979, 989 (2014). Police gang experts, learning on-the-job and at seminars have none of that background or experience. *Down By Law, supra* note 3, at 1052, 1055-58 (internal citations omitted) ("[P]olice officers are not sociologists, and have no training that could qualify them to offer expertise on sociological topics such as 'gang sociology' or 'gang culture.'"); *Interrogation is not Ethnography, supra* note 6, at 141-42 (critiquing police conferences as a basis for expertise in gangs).

As the majority's Opinion reports, Lieutenant David Barnhart of the Maryland Department of Public Safety and Correctional Services (DPSCS) was offered as "an expert in 'gang activity, specifically [DMI] as it relates to the history and founders of DMI, violent customs of DMI, initiation practices and … acts of violence of this gang.'" Slip Op. at 7. I am not sure that this was a very precise description of Lt. Barnhart's proposed testimony. From my review of the trial transcripts, the briefs filed in this Court, and the majority's Opinion, I think it is reasonably clear that Lt. Barnhart ultimately testified that (1) Ingersoll is, and at all relevant times was, a member of DMI; and (2) that under DMI's system of

- [A]n overarching unification of all studies of humankind, including history, psychology, and economics[.]

*Down By Law, supra* note 3, at 1057. (internal citations omitted); *see also* Christopher McGinnis & Sarah Eisenhardt, Note, *Interrogation is not Ethnography: The Irrational Admission of Gang Cops as Experts in the Field of Sociology*, 7 HASTINGS RACE & POVERTY L.J. 111, 129 (2010) (defining sociology) [hereinafter, *Interrogation is Not Ethnography*].

gang discipline, having threatened to kill Collins in front of DMI founder, Perry Roark, Ingersoll himself would be subject to gang punishment, up to a punishment of death, had he failed to follow through and murder Collins. I will evaluate Lt. Barnhart's proposed expert testimony regarding these two topics, which I will refer to by these shorthand references: (1) the DPSCS validation tool; and (2) gang discipline.

In *Rochkind*, the Supreme Court of Maryland provided a non-exhaustive list of factors intended to help trial courts in their consideration of whether a proposed expert's proposed opinions are sufficiently reliable to be admissible. *Rochkind v. Stevenson*, 471 Md. 1, 35-36; Slip Op. at 16-17. The majority's Opinion identifies the *Rochkind* factors but doesn't really apply them. Slip Op. at 17. In the pages that follow, I will do my best to apply the *Rochkind* factors to both aspects of Lt. Barnhart's proposed expert testimony, the DPSCS validation tool and gang discipline. In my view, not a single one of these factors support Lt. Barnhart's admission as an expert. *See Racialized Implications of Officer Gang Testimony*, *supra* note 3, at 172 (noting that courts have failed to carefully examine the validity and reliability of the methods used in police gang testimony).

*The* *Rochkind* *Factors and Lt. Barnhart's Opinions*

**1.      "[W]hether a theory or technique can be (and has been) tested."**

The first *Rochkind* factor asks whether the theory or technique offered by the proposed expert has been tested. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17-18. As to the DPSCS validation tool, Lt. Barnhart explained how the scores are obtained, and provided screenshots showing results from the validation tool. Slip Op. at 9-11. That is helpful and maybe sufficient to DPSCS's needs, but it does not say anything about how the tool has

been tested. Are the scores properly weighted? What are the risks of false positives? Are there, for example, other people in our prison system with tattoos of pit bulls or pyramids? *See* Slip Op. at 9. Are self-admissions of gang membership always true? Slip Op. at 9. Or do inmates sometimes lie? This DPSCS validation tool—no matter how well-presented or formal-looking—has not been tested by the scientific method, as *Rochkind* requires.[7]

And as to gang discipline, the trial court and the majority's Opinion in this case were impressed by Lt. Barnhart's personal experience at DPSCS and thought that his experience qualified him as an expert. At the pre-trial *Daubert* hearing, the trial court concluded that Lt. Barnhart was "proposing to testify about matters that naturally and directly come from a data collection and research into Division of Corrections gang intelligence that has been collected and conducted over the years." Similarly, the majority's Opinion reports that, "Lt. Barnhart's extensive experience and training in prison gangs over many years … served as a reliable basis for him to testify as an expert on those subjects." Slip Op. at 18. To the extent, however, that this is a valid way to gain expertise, its conclusions are

---

[7] For a detailed criticism of California's equivalent to the DPSCS's validation tool, *see Interrogation is not Ethnography, supra* note 6. The authors critique the California gang validation tool based on (1) the unreliability of self-reporting about gang membership, (2) the unreliability of aesthetic markers, like clothing and tattoos, to determine gang membership, and (3) the unreliability of police informant identification of gang membership. *Id*. at 132-39; Susan Burrell, *Gang Evidence: Issues for Criminal Defense*, 30 SANTA CLARA L. REV. 739, 769-73 (1990) (same, discussing California validation tool). *See also* Placido G. Gomez, *It is Not So Simply Because an Expert Says it is So: The Reliability of Gang Expert Testimony Regarding Membership in Criminal Street Gangs: Pushing the Limits of Texas Rule of Evidence 702*, 34 ST. MARY'S L.J. 581 (2003) (critiquing police gang experts' ability to identify gang members and membership under Texas law and Texas's validation tool).

impossible to evaluate in the absence of testing. The interviews that Lt. Barnhart conducted were conducted by a corrections officer not by a sociologist trained in ethnography. *Interrogation is not Ethnography, supra* note 6, at 139-45 (explaining differences between interrogation by law enforcement officers and ethnography conducted by social scientists); *Racialized Implications of Officer Gang Testimony*, *supra* note 3, at 169-70 (2022) (same). Whatever data collection informed Lt. Barnhart's opinions, it came solely from the view of corrections officers. Moreover, Lt. Barnhart's specific opinion about gang discipline seems internally inconsistent. If he has truly "seen many times" that gangs mete out punishment for failure to comply, *see* Slip Op. at 10, then the system of gang discipline isn't really as effective as he describes. I would expect a trained social scientist to rigorously test the hypothesis of gang discipline, not take it for granted based on mixed evidence.

**2.    "[W]hether a theory or technique has been subjected to peer review and publication."**

The second *Rochkind* factor asks whether the theory or technique has been subjected to peer review and publication. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. Neither the trial court nor the majority addressed itself to this factor. I think that this is a critical omission. Lt. Barnhart's proposed testimony received none of the benefits of the scientific method. *See supra* note 5. There was no testimony that the DPSCS validation tool has been published or subjected to peer review. And, as to his views on gang discipline, that was based entirely on his personal observations and never submitted to peer review and

publication. I have a great deal of difficulty understanding it as anything other than generalization and stereotyping.

3. **"[W]hether a particular scientific technique has a known or potential rate of error."**

The third *Rochkind* factor asks whether the scientific technique that the potential expert proposes to use and base their opinion on has a known or potential rate of error. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. Neither the trial court nor the majority's Opinion address this factor, probably thinking it not relevant or applicable. But to me, that's the whole point. Lt. Barnhart's opinions—regarding the DPSCS validation tool and gang discipline—are not based on scientific techniques, have not been subjected to the scientific method, and have no known or potential rates of error. This must count against them.

4. **"[T]he existence and maintenance of standards and controls."**

The fourth *Rochkind* factor asks whether there are standards and controls. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. The trial court, as reported by the majority's Opinion, was satisfied that both the DPSCS validation tool and Lt. Barnhardt's experience were sufficient to the DPSCS's intelligence needs. Slip Op. at 12 ("The short word for that is intelligence."). In my view, while the standards and controls governing Lt. Barnhart's opinions are perhaps sufficient to DPSCS's needs, that does not mean that the standards and controls are sufficient to support an expert's opinion in court.

5. **"[W]hether a theory or technique is generally accepted."**

The fifth *Rochkind* factor considers "whether a theory or technique is generally accepted." *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. In some ways, this factor harkens

back to the old *Frye*/*Reed* standard and suggests that once a particular genre of expert testimony is accepted, it is generally accepted. Thus, after *Gutierrez*, police gang testimony was generally accepted in Maryland courts. *Gutierrez v. State*, 423 Md. 476 (2011) (discussed *supra* note 2). But our Supreme Court has recently pointed out that general acceptance of a theory is "largely dependent on what the relevant community is." *Abruquah v. State*, 483 Md. 637, 691 (2023). Law enforcement and, at least historically, the judiciary, have treated law enforcement as the only relevant community. That can't be right. The relevant community must at least *include* disinterested social science. And I have found nothing to suggest that police gang testimony is generally accepted within this academic community. There are a number of legal academic authors that have criticized the use of police gang experts to testify about the sociology of gangs because their methods are not reliable. *See, e.g. Down By Law, supra* note 3, at 1058-62; Fareed Nassor Hayat, *Preserving Due Process: Require the* <u>Frye</u> *and* <u>Daubert</u> *Expert Standards in State Gang Cases,* 51 N. M. L. REV. 196, 219-24 (2021).

6.     **"[W]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."**

The sixth *Rochkind* factor asks whether the proposed expert testimony grew naturally out of the witness's research or was developed for the purpose of testifying. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. The trial court and the majority Opinion were impressed that Lt. Barnhart's expertise was first developed for internal use at DPSCS. At least one commentator has suggested to the contrary—that this factor should weigh against

forensic techniques developed exclusively for use by law enforcement. Thomas Kiley, *State v. Matthews: Maryland Fails to Measure Up to Its New Expert Testimony Standard*, 82 M~D~. L. R~EV~. 1135, 1156-57 (2023). It is also not plain to me that there could be a market for Lt. Barnhart's expert witness testimony—certainly no defendant would seek Lt. Barnhart's testimony—so I don't think this factor counts in favor of admitting Lt. Barnhart's testimony.

**7.    "[W]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion."**

The seventh *Rochkind* factor asks whether the expert's proposed testimony extrapolates from an accepted premise to an unfounded conclusion. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. Even if we accept that Ingersoll was a gang member at the time of the murder (and we only have his word for it), Lt. Barnhart's testimony jumps from that premise to the unfounded conclusion that the murder was committed to avoid punishment under DMI's gang discipline. *See Abruquah v. State*, 483 Md. 637, 694 (2023) (citations omitted) ("this factor invokes the concept of an analytical gap, as "[t]rained experts commonly extrapolate from existing data[,]" but a circuit court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Suffice to say, I am not persuaded by this extrapolation.

**8.    "[W]hether the expert has adequately accounted for obvious alternative explanations."**

The eighth *Rochkind* factor asks whether the expert has accounted for alternative explanations. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. Neither the trial court nor the majority Opinion focuses on the fact that the instigating episode was that Collins insulted

Ingersoll's mother (or perhaps grandmother). Slip Op. at 4 n.4. No explanation was offered as to why that insult was not sufficient—after all, Ingersoll responded by threatening to kill Collins—but that Ingersoll's gang membership and DMI's gang discipline were necessary to explain why Ingersoll carried through on the threat.

**9.     "[W]hether the expert is being as careful as [they] would be in [their] regular professional work outside [of their] paid litigation consulting."**

The ninth *Rochkind* factor is directed at paid litigation consultants. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. As such, it isn't directly relevant to Lt. Barnhart's situation as he apparently testifies as part of his work. Nevertheless, in thinking about this factor, I consider it significant that Lt. Barnhart is a corrections officer, trained in law enforcement, and is not a disinterested, neutral observer as social scientists are (and are trained to be).

**10.    "[W]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."**

The tenth *Rochkind* factor asks more generally if the kind of expertise proffered is known to reach reliable results. *Rochkind*, 471 Md. at 35-36; Slip Op. at 17. As I discussed in the introduction to this concurrence, the switch from *Frye*/*Reed* to *Daubert*/*Rochkind* was supposed to—and in many ways has—ushered in a new era in forensic testimony based on reliability rather than general acceptance. *See supra* note 1. The trial court found reliability here principally because this type of expertise is sufficient to DPSCS's needs.

\* \* \* \*

In my view, neither of Lt. Barnhart's expert opinions: (1) regarding the DPSCS validation tool; or (2) regarding gang discipline, were reliable. Law enforcement officers are expert at controlling and detecting crime, and those, like Lt. Barnhart and Sgt. Norris

-11-

(discussed *supra* note 2 and *infra* note 8), are expert at controlling and detecting crime committed by gangs in our prisons and on our streets. That is an important expertise. These people do important work to keep us safe. That work, however, is not the same thing as an expertise in the sociology of gangs. None of the *Rochkind* factors should have counted in favor of Lt. Barnhart's acceptance as an expert witness. At the end of the day, it is my view that expert testimony on gang sociology can and should be offered by experts on the sociology of gangs. These witnesses should have an advanced degree in a social science field— sociology, anthropology, criminology/criminal justice, psychology, or the like— and involve serious field work, using the techniques of ethnography, guided by the scientific method, studying gang behavior. Anything else is just repeating gossip and stereotypes. Such expert testimony might have been marginally acceptable under the old *Frye/Reed* standard but fails the promise of *Daubert/Rochkind*.[8] Worse still, by admitting

---

[8] Although it didn't occur here, one of the more egregious examples of police "experts" in gang culture involves those purported experts testifying as to the meaning of words in gang culture, that is, functioning as interpreters of gang language. The skill of interpreting—even of idiomatic vernacular English—is the subject of careful academic study and expert testimony about it should not be based on something a police officer allegedly heard. In my view, the requirements for testifying as a gang vernacular interpreter should be no less rigorous than the requirements for other interpreters in our court system. *See Maryland Court Interpreter Program, Administrative Office of the Courts*, MARYLAND COURTS (available online at https://mdcourts.gov/interpreter/overview) (last visited Feb. 15, 2024). It should come as no surprise that these police gang experts frequently testify that the idiomatic vernacular used in gang communications often matches—quite precisely—the meaning needed to convict. *See, e.g., Freeman v. State*, 259 Md. App. 212, 238-42 (2023) *cert. granted*, No. 221 (Nov. 29, 2023) (No. 24, Sept. Term 2023) (holding that trial court did not err in accepting police gang "expert" testimony that "lick" and "sweet lick" meant "robbery" in gang vernacular; not clear whether police gang expert qualified as an expert or was testifying as a fact witness); Fareed Nassor Hayat, *Preserving Due Process: Require the Frye and Daubert Expert Standards in State Gang Cases,* 51 N.

(continued)

Lt. Barnhart as an expert witness, he received the *imprimatur* of the trial court in front of the jury. I would, therefore, hold that the trial court abused its discretion in admitting Lt. Barnhart as an expert witness in gang sociology.[9]

* * * *

Where does this leave me? For the reasons just discussed, I decline to join the majority's reasoning in Part I of its Opinion. Slip Op. at 17-19. I would hold that the trial

---

M. L. REV. 196, 200 (2021) (describing police gang expert's claim to be able to translate words from Swahili); *Dionte Keith Dutton v. State*, Case No. 2184, Sept. Term 2019, (unreported) (filed Sept. 21, 2021) (available online at https://mdcourts.gov/sites/default/files/unreported-opinions/2184s19.pdf) (last visited Feb. 15, 2024) (police gang expert, Sgt. George Norris, testified that in gang's idiom "doe" meant "gun," precisely the evidence necessary to establish that the defendant ordered his co-defendant to commit the murder). Slip op. at 11-12. This Court reversed the defendant's conviction due to inflammatory and prejudicial statements made by the prosecutor in closing arguments. *Id.* at 13-25 (holding prosecutor's comments were prejudicial). And while this Court noted that admissibility of expert testimony at a retrial would be governed by *Daubert/Rochkind*, not *Frye/Reed* as it had been at the original trial, *id.* at 10 n.4; 11 n.6, I regret that we did not hold that police gang expert testimony of the kind offered— "doe" means "gun"—would be unreliable and therefore likely inadmissible under the new standard.

[9] Although there has been a lot of dispute—at least among the appellate bench and bar— about the proper application of the standard of review of decisions of trial courts to admit or reject expert witness testimony since *Rochkind*, *see, e.g., Katz, Abosch, Windesheim, Gershman, & Freedman, P.A. v. Parkway Neuroscience and Spine Institute, LLC*, 485 Md. 335, 364-84 (2023) (Booth, J. concurring); Derek Stikeleather, *2023 and the Summer of *Daubert,** MARYLAND APPELLATE BLOG (available online at https://mdappblog.com/2023/09/07/2023-and-the-summer-of-daubert/#more-5157) (last viewed Feb. 15, 2024); and although everyone seems to agree that reversal on these grounds should be "rare," Slip Op. at 15 (quoting *State v. Matthews*, 479 Md. 278, 306 (2022)), here I think the trial court's decision misapplied the legal standard, and, as a result, its decision constituted an abuse of discretion. *Levitas v. Christian*, 454 Md. 233, 244 (2017) (quoting *Neustadter v. Holy Cross Hosp. Of Silver Spring, Inc.*, 418 Md. 231, 242 (2011) ("The trial court must apply the correct legal standard and 'a failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion.'") Thus, I would find error, albeit harmless error, under any potential standard of review.

court abused its discretion in allowing Lt. Barnhart to testify as an expert in the sociology of gangs. I do, however, join Part II of the majority's Opinion. Slip Op. at 23-31. In my view, the trial court did not err in finding that Doe was acting under the supervision of law enforcement when she made the recordings of her conversations with Ingersoll. As a result, it was proper for the jury to hear and consider Ingersoll's recorded admissions, including his admission that he had murdered the victim, Collins. Slip Op. at 4-5. Given the admissibility and admission of Ingersoll's confession, I would hold that the error in admitting Lt. Barnhart's expert testimony was harmless beyond a reasonable doubt. *See, e.g., Bellamy v. State,* 403 Md. 308, 332 (2008) (discussing harmless error standard). That is to say, it is my view that there is simply no possibility that a jury—any jury—would have acquitted Ingersoll even if the trial court had excluded Lt. Barnhart's expert testimony. I, therefore, concur in the result only.